CA No. 15-15755

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

\*\*\*

RICKEY DENNIS COOPER,

      Petitioner/Appellant,

vs.

BRIAN E. WILLIAMS[1], Warden,

      Respondent/Appellee.

D.C. No. 3:97-cv-222-JCM-WGC

(District of Nevada, Reno)

Appeal from the United States District Court
for the District of Nevada

**APPELLANT'S OPENING BRIEF**

RENE L. VALLADARES
Federal Public Defender
\*MEGAN C. HOFFMAN
Assistant Federal Public Defender
DANICE ARBOR JOHNSON
Research and Writing Attorney
411 E. Bonneville, Ste. 250
Las Vegas, Nevada 89101
702-388-6577

\*Counsel for Appellant

---

[1] Pursuant to Fed.R.App.Proc. 43(c)(2), Cooper hereby substitutes Brian E. Williams as the Warden in place of E.K.McDaniel.

i

# TABLE OF CONTENTS

I. STATEMENT OF JURISDICTION ...................................................1

II. CERTIFIED ISSUES PRESENTED FOR REVIEW .....................1

    A.   Whether The State Violated Cooper's Right To Due
         Process Under *Napue v. Illinois*. ......................................1

    B.   Whether The State Violated Cooper's Right To Due
         Process Under *Brady v. Maryland*. ...................................1

III. BAIL STATUS OF APPELLANT .................................................1

IV. STATEMENT OF THE CASE .......................................................2

    A.   Procedural History ........................................................2

    B.   Statement of Facts ........................................................4

V. SUMMARY OF ARGUMENT .......................................................6

VI. ARGUMENT ................................................................................7

    A.   Standard of Review .......................................................7

    B.   Cooper's Conviction Was Procured Through The Use
         Of Knowingly False Testimony. ......................................8

         1.   Wells Testified Falsely At Trial. ...............................8

               a.   Wells's 1983 Witness Voucher ........................11

               b.   Wells's 1983 Trial Testimony .........................12

               c.   Harmon's 1983 Trial Statements ....................12

               d.   Wells's 2001 D.A. Interview ...........................13

          2.   The Prosecution Knew Or Should Have Known
             That Wells's Testimony Was False. ........................18

          3.   The False Evidence Was Material. ..........................20

    C.   The Prosecution Failed To Produce Evidence
         Regarding A Material Trial Witness. ...............................20

         1.   The Evidence Was Favorable To Cooper. ................21

2. The Evidence Was Suppressed By The Prosecution. ........................................22

3. The Evidence Was Material. ................................24

D. Materiality Of Wells's Trial Testimony .........................24

1. The Prosecutor Confirmed That Wells's Testimony Was Material. ......................................26

a. Prosecutor's Statements At The 1983 Trial...31

b. Prosecutor's Testimony At The 2002 Deposition....................................................37

2. Trial Court's Questioning Of Wells Demonstrates The Materiality Of Wells's Testimony. ..................38

3. Defense Counsel's Inability To Cross-Examine Wells ................................................................39

E. Nevada Supreme Court Opinion ....................................43

1. The NSC Used The Wrong Standard Of Review.....44

2. The NSC Overlooked And Misapprehended Material Facts And Questions Of Law. .................48

VII. CONCLUSION .........................................................................62

VIII. STATEMENT OF RELATED CASES ....................................63

IX. CERTIFICATE OF COMPLIANCE .........................................63

CERTIFICATE OF SERVICE .......................................................64

## TABEL OF AUTHORITIES

**Federal Cases**

*Ake v. Oklahoma*, 470 U.S. 68 (1985) .................................................... 44

*Alcorta v. Texas*, 355 U.S. 28 (1957) .................................................... 19

*Ali v. Hickman*, 584 F.3d 1174 (9th Cir. 2009) ..................................... 7

*Amado v. Gonzalez*, 758 F.3d 1119 (2014) .......................................... 45

*Bagley v. Lumpkin*, 798 F.2d 1297 (9th Cir. 1986) ............................. 61

*Benn v. Lambert*, 283 F.3d 1040 (9th Cir. 2002) ..................... 25, 33, 35

*Brady v. Maryland*, 373 U.S. 83 (1963) ............................... 3, 20, 22, 61

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) ........................................ 46

*Brown v. Borg*, 951 F.2d 1011 (9th Cir. 1991) ..................................... 33

*Commonwealth of N. Mar. I. v. Bowie*, 243 F.3d 1109 (9th Cir. 2001)   20

*Comstock v. Humphries*, 786 F.3d 701 (9th Cir. 2015) ....................... 21

*Cooper v. Neven*, 641 F.3d 322 (9th Cir. 2011) ............................. 4, 5, 44

*Dow v. Virga*, 729 F.3d 1041 (9th Cir. 2013) ...................................... 46

*Giglio v. United States*, 405 U.S. 150 (1972) ................................ *passim*

*Hall v. Dir. of Corr.,* 343 F.3d 976 (9th Cir. 2003) ......................... 19, 35

*Hayes v. Brown*, 399 F.3d 972 (9th Cir. 2005) (en banc) ..................... 18

*Horton v. Mayle*, 408 F.3d 570 (9th Cir. 2005) ............................... 25, 31

*Imbler v. Pachtman*, 424 U.S. 409 (1976) ........................................... 23

*Jackson v. Brown*, 513 F.3d 1057 (9th Cir. 2008) ........................ *passim*

*Killian v. Poole*, 282 F.3d 1204 (9th Cir. 2002) .............................. 35-36

*Kyles v. Whitley*, 514 U.S. 419 (1995) ..................................... 22, 23, 31

*Marshall v. United States*, 414 U.S. 417 (1974) .............................. 45-46

*Maxwell v. Roe*, 628 F.3d 486 (9th Cir. 2010) ..................................... 19

*Napue v. Illinois*, 360 U.S. 264 (1959) ......................................... *passim*

*Panetti v. Quarterman*, 551 U.S. 930 (2007) ........................................ 7

*Paradis v. Arave*, 240 F.3d 1169 (9th Cir. 2001) ................................. 25

*Paulino v. Castro*, 371 F.3d 1083 (9th Cir. 2004) ............................... 47

*Rompilla v. Beard*, 545 U.S. 374 (2005) .................................................. 7

*Smith v. Cain*, 565 U.S. 73 (?YEAR?) .................................................. 47

*Strickler v. Greene*, 527 U.S. 263 (1999) ........................................ 21, 45

*United States v. Acosta*, 357 F. Supp. 2d 1228 (D. Nev. 2005) ........... 60

*United States v. Bagley*, 473 U.S. 667 (1985) ........................... 22, 25, 42

*United States v. Kojayan*, 8 F.3d 1315 (9th Cir. 1993) ............ 36, 38, 39

*United States v. Young*, 17 F.3d 1201 (9th Cir. 1994) ........................ 61

*Wearry v. Cain*, 577 U.S. ___, 2016 WL 854158 (Mar. 7, 2016) .......... 46

*Ylst v. Nunnemaker*, 501 U.S. 797 (1991) ........................................... 43

## Federal Statutes

28 U.S.C. § 1291 (2012) ............................................................. 1

28 U.S.C. § 2253 (2012) ............................................................. 1

28 U.S.C. § 2254 (2012) ........................................................... 1, 3

28 U.S.C. § 2254(d) (2012) ........................................................... 7

28 U.S.C. § 2254(d)(1) (2012) ..................................................... 44

28 U.S.C. § 2254(d)(2) (2012) ..................................................... 44

28 U.S.C. § 2254(e)(1) (2012) ....................................................... 7

## State Cases

*Jimenez v. State*, 918 P.2d 687 (Nev. 1996) ....................... 22-23, 23, 42

*State v. Bennett*, 81 P.3d 1 (Nev. 2003) ................................... 23

## Other

Fed. R. App. P. 32(a)(5) ............................................................ 63

Fed. R. App. P. 32(a)(6) ............................................................ 63

Fed. R. App. P. 32(a)(7)(B) ....................................................... 63

Fed. R. App. P. 32(a)(7)(B)(iii) ................................................. 63

Fed. R. App. P. 43(c)(2) ............................................................... 1

# I.
# STATEMENT OF JURISDICTION

This is an appeal from an Order and Judgment of a United States District Court entered on March 17, 2015, denying Petitioner-Appellant Rickey Dennis Cooper's ("Cooper") Amended Petition For Writ of Habeas Corpus brought pursuant to 28 U.S.C. §2254. EOR 5. The district court also denied a certificate of appealability ("COA"). *Id.*

Cooper filed a timely notice of appeal. EOR 3. He also filed a timely Application for a COA to this Court on April 17, 2015. Docket #2. This Court granted the COA on December 2, 2015. Docket #5. This Court has jurisdiction pursuant to 28 U.S.C. §§1291, 2253.

# II.
# CERTIFIED ISSUES PRESENTED FOR REVIEW

A.   Whether The State Violated Cooper's Right To Due Process Under *Napue v. Illinois*.

B.   Whether The State Violated Cooper's Right To Due Process Under *Brady v. Maryland*.

# III.
# BAIL STATUS OF APPELLANT

Cooper is in custody of the Nevada Department of Corrections serving two consecutive sentences of life without the possibility of parole and a consecutive aggregate sentence of sixty-five years. Electronic Case Filing (ECF) 54, Ex.25; Excerpt of Record (EOR) 157.

# IV.
# STATEMENT OF THE CASE

## A.    Procedural History

On June 13, 1983, an Information was filed in Las Vegas, Nevada charging Cooper with Attempt Robbery With Use of a Deadly Weapon of Larry Collier, Attempt Murder With Use of a Deadly Weapon of Larry Collier, Battery With Use of a Deadly Weapon of Will Norman, and First Degree Murder with Use of a Deadly Weapon of Ricky Williams.   EOR 358.  The State sought the death penalty.  EOR 418.  Cooper went to trial, represented by appointed counsel Robert Wolf, and was found guilty on all counts on November 7, 1983.  EOR 978.  The jury rejected the State's request to sentence Cooper to death.  EOR 1085.  Judgment was entered on January 20, 1984, sentencing Cooper to two consecutive sentences of life without the possibility of parole (Count 4) with additional 65-year consecutive sentences for Counts 1 – 3.  EOR 157.

Cooper's direct appeal, which only raised two sentencing issues, was rejected by the Nevada Supreme Court on May 15, 1986.  EOR 154. The state trial court's denial of Cooper's state post-conviction petition was affirmed by the Nevada Supreme Court on September 21, 1988. EOR 147.

Cooper commenced the instant action on March 18, 1997.  ECF 4. The Federal Public Defender was appointed and an amended petition was filed on February 17, 1998.  ECF 23.  On February 24, 1999, the

2

district court dismissed Cooper's §2254 petition without prejudice on exhaustion grounds. EOR 134.

Meanwhile, Cooper was also litigating his pro se third state post-conviction action, which he commenced on August 21, 1997. EOR 1100. After the trial court dismissed the state habeas petition with prejudice (EOR 1145), the Nevada Supreme Court ordered the case remanded for an evidentiary hearing to determine whether Cooper demonstrated adequate cause to excuse the applicable default, and if so, whether he was entitled to relief on the merits of his witness recantation and *Brady* claims[2].

Following the December 17, 2004 evidentiary hearing (EOR 1320), the trial court denied Cooper's petition on procedural default grounds. EOR 117. The Nevada Supreme Court affirmed the trial court's denial of the post-conviction petition finding that Cooper had demonstrated cause for not raising the witness recantation and *Brady* claims earlier, but that he had not demonstrated prejudice. EOR 88.

Cooper moved to reopen his federal habeas petition (ECF 45), which was granted by the district court on September 27, 2006. ECF 50. Cooper filed an amended petition. EOR 159. The district court granted Respondents' motion to dismiss finding that the amended petition was procedurally barred and denied Cooper a COA. EOR 75. This Court

---

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

granted a COA, reversed in a published opinion the district court's finding of procedural default regarding Cooper's *Brady* and *Napue* claims,[3] and remanded to the district court for further proceedings. EOR 59; *see also Cooper v. Neven*, 641 F.3d 322, 333 (9th Cir. 2011).

Following the United States Supreme Court's denial of Respondents' Petition For Writ of Certiorari (ECF 110) and remand to the district court, Cooper litigated another motion to dismiss, which again alleged, *inter alia,* that Cooper's *Brady/Napue* claims were not timely filed, unexhausted, and procedurally barred from review. ECF 121. The district court denied Respondents' motion to dismiss (EOR 35) and following merits briefing the court denied Cooper's claims and denied a COA. EOR 6. On September 21, 2015, this Court granted a COA. EOR 1.

## B.    Statement of Facts

Cooper was convicted of the attempted murder of Larry Collier ("Collier"), attempted robbery of Collier of drugs that Collier bought at the scene, and the shooting death of Ricky Williams ("Williams") outside of HiView Market in Las Vegas, Nevada. EOR 978. Cooper was also convicted for battery of Will Norman, who was working inside Seven Seas

---

[3] *Napue v. Illinois*, 360 U.S. 264 (1959).

Fish Market, who was shot in the hand by a stray bullet while standing inside the market.[4] *Id.*

Because the eyewitness testimony as to Cooper's involvement regarding the events at issue was contradictory, the prosecution resorted to introducing the witnesses' prior inconsistent police statements and/or preliminary hearing testimony to impeach their own witnesses' trial testimony. It was at this time that district attorney investigators picked up 15 year-old Donnell Wells ("Wells") from school, without notifying his parents (EOR 1639), and brought him to court to testify at Cooper's trial that he saw Cooper shoot Williams. EOR 1330-1332. The prosecutor described Wells as a "key witness in this case" (EOR 1535), and later deemed him a "hero" for his testimony. EOR 920.

In 1997, however, Wells recanted his trial testimony. *See* Wells's Declaration, EOR 1251. Wells testified at the evidentiary hearing he did not see Cooper shoot the victims and the investigators pressured him to testify that Cooper was the shooter. EOR 1335-1336. Wells also testified that the investigators coached him and told him that he would get more money if he testified they way they wanted him to. EOR 1334-1336. Wells stated that after he testified on the afternoon of November 3, 1983, an investigator gave him a "paper," took him to cash the paper for "close to a hundred dollars," then took him to a local mall where he bought jeans

---

[4] The prosecution's diagram of the scene is located at EOR 417.

and tennis shoes, and dropped him off in front of his home.  EOR 1336-1337.

## V.
## SUMMARY OF ARGUMENT

Cooper satisfies all requirements for a *Napue v. Illinois* violation. Wells recanted his trial testimony that he saw Cooper shoot Williams and told district attorney investigators it was too dark and he could not see who shot Williams.  The investigators told Wells that Cooper shot Williams and that he would receive money if he testified at trial that Cooper was the shooter.  The prosecutor acknowledged that Wells was a "key witness".  EOR 1535.  Wells's false and coached testimony prejudicially affected the jury's finding of guilt.

Cooper also satisfies all requirements for a *Brady v. Maryland* violation.  The State failed to produce exculpatory and impeaching evidence relating to the credibility of Wells by failing to advise Cooper that Wells told the investigators that it was too dark for him to see who the shooter was and of the promises of money to Wells (and received) in exchange for Wells's false and coached testimony.  Had the jury been advised of this exculpatory and impeachment evidence, there is a reasonable probability that the outcome of the trial would have been different given Wells's importance to the prosecution of Cooper.

# VI.
# ARGUMENT

## A.    Standard of Review

This Court reviews the district court's denial of Cooper's petition *de novo*. *See Ali v. Hickman*, 584 F.3d 1174, 1181 (9th Cir. 2009).  Cooper's petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  28 U.S.C. §2254(d) permits federal courts to grant habeas relief to a state prisoner if the state court's decision (1) resulted in a decision that was contrary to or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  A determination of a factual issue made by a state court shall be presumed to be correct.  28 U.S.C. §2254(e)(1).

If a petitioner can overcome the threshold requirements of 2254(d)(1) or (d)(2), by showing that it was contrary to or was an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts, then the claim is reviewed *de novo* by the federal court.  *See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007).  If the state court does not address a prong of a federal constitutional inquiry, the federal court must address that prong *de novo*. *Rompilla v. Beard*, 545 U.S. 374, 390 (2005).

7

## B.    Cooper's Conviction Was Procured Through The Use Of Knowingly False Testimony.

"[A] conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue*, 360 U.S. at 269. "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* For Cooper to prevail on his *Napue* claim, he must show that (1) Wells's testimony was actually false, (2) the prosecution knew or should have known that Wells's testimony was actually false, and (3) that Wells's false testimony was material. *Jackson v. Brown*, 513 F.3d 1057, 1071 (9th Cir. 2005).

### 1.    Wells Testified Falsely At Trial.

Wells recanted his trial testimony, acknowledged that he did not see Cooper shoot the victims, and admitted that he perjured himself at trial when he testified that Cooper was the shooter. EOR 1363-1364.

At trial, the essence of Wells's testimony was that he saw Cooper, in the front passenger seat, shoot at Williams from a moving car. EOR 714. Wells testified that the car made a U-turn, came back, and Cooper shot at Williams again. *Id.* Wells testified that he saw Norman get shot inside the market while Norman was "standing right by the door" with "his hand on the door of the fish market." EOR 718.

In 1997 Wells executed a Declaration wherein he stated he "did not see Cooper shoot the victims" and the detectives pressured him to testify,

8

telling him the facts they wanted him to testify to. EOR 1251. Wells stated that the detectives promised him money if he testified. After his testimony against Cooper, he was given a "piece of paper," which was redeemed for cash and was taken to the mall where he bought shoes and jeans. *Id.; see* Witness Voucher, EOR 1253.

Wells's testimony at the 2004 evidentiary hearing that he testified falsely against Cooper at trial was consistent with his Declaration. Wells identified the primary "police detective that he spoke to as Eddie Shields (EOR 1331), an investigator with the district attorney's ("D.A.") office.[5]

Wells testified that he was 15-years-old and in the 9th grade when the D.A. investigators came and removed him from school. EOR 1331-1332. The investigators then drove to a different school and removed a girl (Barbara Denise Wesley aka "DeeDee") and drove both juveniles to the courthouse. EOR 1332-1333. Wells told the investigators that it was too dark and he could not see who did the shooting. EOR 1335. The investigators promised Wells money if he testified against Cooper. They told him what to say and that he could only get the money if he testified that Cooper was the shooter.

> Q:  Did you initially tell them it was too dark and
>     you didn't know exactly who the shooter was?
> A:  Yeah.

---

[5] The district attorney investigators in Cooper's case were Eddie Shields and Olan Rakes.

Q:    And then did he tell you that he believed that
      Rickey Cooper was the shooter?
A:    Well, he didn't say, if I remember, he didn't
      say that he believed nothing.  He just said
      that Rickey Cooper was the shooter.
Q:    So he told you Rickey Cooper was the
      shooter?
A:    Yes.
Q:    And he indicated to you that he could only
      use you and give you this money if you
      testified what?
A:    In the way he – he wanted me to testify.
Q:    Which was what?  What did he want you to
      say?
A:    That Rickey Cooper was the shooter.

EOR 1335-1336.

At the evidentiary hearing, Wells testified that before he testified

at trial, he was shown a diagram of the scene.  EOR 1343, 1345.  When

Wells was unable to accurately repeat the version of events as told to him

by the investigators, Wells testified that he was taken out to the hallway

of the courtroom by Shields and another Caucasian man and coached as

to what his testimony should be.  EOR 1353-1355, 1357, 1361.  Wells then

testified that Cooper was the shooter.  EOR 1336, 1347.  Wells testified

that Harmon was not in the hallway during the time he was being

coached by the investigators how to testify.  EOR 1346.

10

During cross-examination by the State, Wells acknowledged that he perjured himself at trial. EOR 1364. Wells testified that he was given "checks", and Investigator Shields took him to a place to cash it. EOR 1336. Wells received "close to a hundred dollars," was driven to the mall where he bought Levi Jeans and K-Swiss tennis shoes, and was then dropped off in front of his home by Shields. EOR 1336-1337.

Wells admittedly gave false testimony at trial. The following facts provide independent corroboration of the veracity of Wells's recantation and evidentiary hearing testimony: (1)Wells's 1983 witness voucher, (2)Well's 1983 trial testimony, (3)statements made by the prosecutor at the 1983 trial, and (4)Wells's 2001 interview by a district attorney investigator.

### a. Wells's 1983 Witness Voucher

Wells testified that the D.A. investigator promised him "money" if he testified that Cooper was the shooter (EOR 1335-1336) and that he was given "close to $100.00 for his coached and false testimony against Cooper. EOR 1336. This is corroborated via the witness voucher (EOR 1253), initialed by Harmon. Wells did receive, at a minimum,

$75.00 from Respondents, purportedly for 3 days of testimony ($25.00 x 3 days).[6]

### b. Wells's 1983 Trial Testimony

Respondents attempted to portray the $75.00 Wells received from the State as a legitimate witness fee, paid to Wells for his appearance at trial as well as for pretrial conferences with Harmon. ECF 63, Ex.104 at 7. At trial Wells testified that he had not spoken with Harmon before the day he was brought to court. EOR 1337, 1351. Wells was picked up from school on the third day of trial, testifying that one afternoon only. EOR 710.

In 1983, during cross-examination by defense counsel, Wells testified he first spoke with Harmon at 12:30p.m. on the day he testified at trial. EOR 738. Wells testified in 1983, just as he did at the 2004 evidentiary hearing, that he did not meet with Harmon until the day he testified at trial.

### c. Harmon's 1983 Trial Statements

Harmon's in-court statements in 1983 confirm Wells's 1983 and 2004 testimony that he had not met with Harmon prior to his the day he testified at trial.

---

[6] The purported legitimacy of the witness fees for pretrial conferences does not determine the issue of the falsity of Wells's testimony. *See Argument* D, below.

On the first day of trial, defense counsel repeated his request for discovery, specifically with regard to Wells and Wesley, advising the court: "I don't have any idea what they might be testifying to …". EOR 434. Harmon responded:

> With Barbara Denise Wesley and Donnell Wells, Mr. Wells is a young 16 year-old lad. They are alleged to be eye-witnesses to this incident. But there are no formal statements. I've obtained personal service of them. **I haven't spoken to them myself.** I got their names from the Walker [victim's] family.

EOR 435 (emphasis added.) At the 1983 trial, Both Harmon and Wells are clear that they never met before the afternoon Wells testified in court.

### d. Wells's 2001 D.A. Interview

Wells did not deviate from his recantation during an interview by the D.A.'s office in 2001. Elbert Hill, an investigator with the district attorney's office, conducted a pre-evidentiary hearing interview with Wells on September 21, 2001. EOR 1296. During the interview, Wells told Mr. Hill he could not see who fired the shots (EOR 1307), the D.A. investigators coached him as to how they wanted him to testify at trial and promised him money for his testimony. EOR 1301, 1305-1307. Nevertheless, Mr. Hill ("EH") repeatedly told Wells ("DW") that he was wrong and was merely paid a legitimate witness fee by the State.

DW: Well, he said, well, he said when you testify you can get your money. After you testify we'll give you some money for testifying.

EH: Witness fees.

DW: [Inaudible.]

EH: OK. You realize that all witnesses are provided fees for …

DW: I don't know.

EH: OK. Every witness that comes into court is entitled to a witness fee based on Nevada statute. Apparently you aren't aware of that, right?

DW: I wasn't aware then. But now.

EOR 1303-1304. Wells then stated:

DW: Well, like I told 'em at first, I couldn't really see exactly who it was.

DW: You know. And then he said well in order for us to use your testimony, you have to answer the questions this way.

EH: Did they ever ask you to identify Cooper as the shooter?

DW: Yeah.

. . .

EH: Well apparently they feel that there was some improprieties in your statements or that there was some improprieties in terms of the information that you provided with the allegations that you were paid for your testimony, which in fact is erroneous. You were paid witness fees which is perfectly legal based on Nevada statute. . . . Did anyone ask you to lie?

DW: If I tell you that is gonna be perjury.

14

EOR 1307-1308. Investigator told Wells that he had not been

coached.

> EH:  . . . Someone may have talked to try and at
> least get some semblance of a factual
> statement from you during your testimony
> but it was not a coerced statement nor was it
> a statement that was paid for other than the
> fact that you were paid witness fees.  And
> that's what you are telling me now.  You were
> paid witness fees.  No one presented you with
> any cash above that which you were entitled
> to as a witness in the State of Nevada.
>
> DW:  No.  He gave me more money [inaudible].
>
> EH:  He gave you more money?
>
> DW:  Yeah.
>
> EH:  What did he give you?
>
> DW:  He said I was supposed to get twenty dollars.
> Twenty-five dollars or something.  The man
> give [sic] me about a hundred bucks
> [inaudible].
>
> EH:  Gave you a hundred dollars.
>
> DW:  Yeah.  He gave me, he said that was more
> than I was supposed to get.

EOR 1308-1309.  Throughout the interview, the investigator relentlessly

told Wells that he had merely received a legitimate witness fee in

conformance with Nevada law using the words "legitimate" and "witness

fee" exactly 31 times in an attempt to pressure Wells and influence his

evidentiary hearing testimony.

> EH:  Based on what you're saying is that
> everything that transpired in this matter

> was legal. . . . You were paid as a witness. Not for your statement. We didn't pay you for the truth.

DW: I ain't seen you before in my life.

EH: I know. . . . Now when you testified, as I informed you as a Nevada citizen and as to state law, you were required to receive a witness fee. Not because someone said we want you to testify like this and you'll be paid. That didn't occur. . . . Regardless as to how you testified you would have received the witness fee. Good, bad, or indifferent. You would have received a witness fee. Did that sound clear to you? . . . You came to court and you're gonna get paid. Now does that appear clear?

. . .

EH: . . . I'm saying and I hope you understand what I'm saying, is that you're entitled to a witness fee. Have I made that clear? . . .

DW: Yes. You have, sir.

EOR 1311-1312. Despite his claim to the contrary, the investigator appears to threaten Wells with the prospect of perjury.

> EH: . . . Now, if you want to be a part of this nonsense that Rickey is about to throw up in the court's face, that's fine, but I want you to be aware that if you get up and perjure yourself, now you are going to be looking, I'm not threatening you, but I'm telling you what the practical aspect of this is.

EOR 1311. D.A. Investigator Hill concluded his interview:

> EH: . . . They've had Ricky's butt on ice for twenty years.
>
> DW: And you want me to keep him there.

16

> EH: Life without possibility of parole. He's not fit to live among decent people. You want Ricky out living in your neighborhood again?
>
> DW: I don't care.
>
> EH: Well I do.
>
> DW: You want me to say, to testify.
>
> EH: You know. I think I've treated you pretty decent. … [G]uys like Ricky Cooper are maggots. Their [sic] predators. I don't like predators. It doesn't matter. Stripes don't change. A zebra is a zebra. Wash off the stripes, he's still a zebra. Straight up. Straight up. It's born character.

EOR 1317-1318. Despite the D.A. investigator's repeated attempts to convince Wells the money he received was a legitimate witness fee and change his acknowledgment of false testimony, Wells testified that he did not see who shot Williams and that he was promised and given more money than he was entitled to receive in exchange for his testimony that Cooper shot Williams.

For the reasons outlined above, in view of Wells's 1997 Affidavit, 2001 D.A. interview and 2004 evidentiary hearing testimony, Wells's trial testimony that he saw Cooper shoot Williams was false.

2.   **The Prosecution Knew Or Should Have Known That Wells's Testimony Was False.**

The prosecution elicited testimony from Wells that was false. The State knew (D.A. investigators Shields and Rakes) and/or should have known (Harmon) that Wells's trial testimony was false.

The Supreme Court imputes to the prosecutor the knowledge of other government officials operating on behalf of the prosecution team. *Napue* applies whenever a prosecutor "knew or should have known that the testimony was false." *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc) (internal quotations and citations omitted.) "*Napue* and *Giglio*[7] make perfectly clear that the constitutional prohibition on the 'knowing' use of perjured testimony applies when **any** of the State's representatives would know the testimony was false." *Jackson v. Brown*, 513 F.3d at 1075 (emphasis in original.)

Wells told the investigators that it was too dark and that he did not see who did the shooting. EOR 1334-1335. The investigators told him that Cooper was the shooter and promised Wells "money" that he would only receive if he testified Cooper was the shooter. EOR 1335-1336. The D.A. investigators, acting as state agents, were clearly aware they induced, coached, and arranged to have Wells "paid" for his testimony.

_____

[7] *Giglio v. United States*, 405 U.S. 150 (1972). In *Giglio*, the Supreme Court found reversible error under both *Napue* and *Brady*.

The prosecution continues to fail to abide by their constitutional obligation to correct the false testimony. *Napue*, 360 U.S. at 269. Despite D.A. Investigator Hill's attempts (during the pre-evidentiary hearing interview some 18 years after the trial) to convince Wells that he was not coached and had merely received a "legitimate witness fee" from the State of Nevada, Wells told Investigator Hill that in 1983 he was told that that he was to receive around $20.00-25.00, but that he would be given more money than he was entitled to if they could use his testimony. EOR 1309-1311. The State has a current and continuing duty to correct the error based on the present knowledge that evidence was falsified. *See Napue*, 360 U.S. at 269; *Alcorta v. Texas*, 355 U.S. 28 (1957); *see also Hall v. Director of Corrections*, 343 F.3d 976, 981 (9th Cir. 2003); *Maxwell v. Roe*, 628 F.3d 486, 507 (9th Cir. 2010).

There was an agreement between the D.A. investigators and Wells in exchange for his testimony against Cooper. Wells believed that agreement was that he would testify that Cooper was the shooter and he would then receive money. Wells testified how the investigators instructed him to. Wells received the money that was promised to him, legitimate witness fee or otherwise, was driven to the mall by D.A. Investigator Shields to make purchases, and then dropped off in front of his home.

The prosecution's constitutional duty at Cooper's trial was not discharged "by attempting to finesse the problem by pressing ahead

without a diligent and a good faith attempt to resolve" the issues concerning the D.A. investigators' removal of 15-year-old Wells from school without his parents' knowledge, being brought to court with the promise of monetary reward, and the coaching by the investigators to testify falsely in a capital murder trial. *See Commonwealth of Northern Mariana Islands v. Bowie*, 243 F.3d 1109, 1118 (9th Cir. 2001).

For the reasons outlined above, Cooper has demonstrated that Wells's testimony was false and the prosecution knew or should have known Wells's testimony was false.

### 3. The False Evidence Was Material.

Because of the inter-related facts of Cooper's *Napue* and *Brady* claims, the materiality component for both claims will be addressed jointly in Argument Section D, below.

### C. The Prosecution Failed To Produce Evidence Regarding A Material Trial Witness.

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." The *Brady* rule is based on the principle that a prosecutor cannot obtain a conviction based on fraudulent means or perjured testimony. *Brady*, 373 U.S. 86, *citing Napue*, 360 U.S. at 269; *see also Giglio*, 405 U.S. at 153.

For Cooper to prevail on his *Brady* claim, he must show (1) the evidence was favorable, either because it is exculpatory or impeaching;(2) the evidence was suppressed by the State; and (3) prejudice must have resulted. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

## 1. The Evidence Was Favorable To Cooper.

Wells's false testimony and coaching by the investigators, especially given Wells's role in the trial, was both exculpatory and impeachment evidence. "[E]vidence that has any affirmative, evidentiary support for the defendant's case or any impeachment value, is, by definition, favorable." *Comstock v. Humphries*, 786 F.3d 701, 708 (9th Cir. 2015), *citing Strickler*, 527 U.S. at 281-82. Wells told D.A. investigators that it was too dark and he could not see who the shooter was. EOR 1307, 1335. The investigators told Wells that Cooper was the shooter, coached Wells as to what his testimony should be, and promised him money that he could only receive if he testified that Cooper was the shooter. EOR 1335-1336, 1346-1347, 1353.

The *Brady* rule encompasses evidence that may be known not only to the prosecutor but to state agents as well. *Strickler*, 527 U.S. at 280, *citing Kyles v. Whitley*, 514 U.S. at 434. The prosecution had a duty under *Brady* to inform the defense of Wells's exculpatory statements regarding his inability to identify Cooper as the shooter. The prosecution had the additional duty to inform the defense that Wells's testimony was coached and of the arrangement for monetary compensation made

between the investigators and Wells in exchange for his testimony. The undisclosed arrangement bore directly on Wells's credibility because the promise of money provided the motive for Wells's acquiescence to testify falsely against Cooper. Evidence undermining the credibility of Wells— that it was too dark to see the shooter and that he testified falsely to receive money—is "evidence favorable to the accused so that if disclosed and used effectively, it may make the difference between conviction and acquittal." *United States v. Bagley*, 473 U.S. 667, 676 (1985).

### 2. The Evidence Was Suppressed By The Prosecution.

A prosecutor's ignorance of *Brady* material in the possession of other law enforcement agencies doesn't excuse the prosecutor's continuing duty to provide exculpatory/impeachment information. *Kyles*, 514 U.S. at 437. The conduct of the State with regard to Wells demonstrates an agreement and/or understanding was made between the investigators and Wells that should have been disclosed.

That Harmon was not in the courthouse hallway when Wells was being coached by the investigators to testify Cooper was the shooter does not negate the prosecutor's duty of disclosure. Harmon is constructively charged with that knowledge. This affirmative duty placed on the prosecution under *Brady* applies whether the withholding of the evidence was intentional or inadvertent. 373 U.S. at 87; *see also Jiminez v. State*, 918 P.2d 687, 695 (Nev. 1996) ("[E]ven if the detectives withheld their reports from the prosecutor's knowledge, the state attorney is charged

with constructive knowledge and possession of evidence withheld by other state agents … .")

The prosecution's *Brady* obligation is to disclose material exculpatory/impeachment evidence on its own, without request. *Kyles*, 514 U.S. at 432-34; *Jiminez v. State*, 918 P.2d at 692.[8]  "Moreover, that duty exists regardless of whether the State uncovers the evidence before trial, during trial, or after the defendant has been convicted. *State v. Bennett*, 81 P.3d 1, 9 (Nev. 2003)[9] , *citing Imbler v. Pachtman*, 424 U.S. 409, 427 n.25 (1976) (A "prosecutor is bound by the ethics of his office to inform the appropriate authority of after-acquired or other information that casts doubt upon the correctness of the conviction.")

In response to defense counsel's specific request for discovery regarding Wells (EOR 434), a request not required by *Brady*, Harmon advised: "There are no formal statements prepared by any of them, so there is nothing tangible to provide in the way of discovery. … I have not spoken personally to them myself."  EOR 435.  Despite counsel's

---

[8] *Jiminez*, a key Nevada discovery case, was prosecuted by Harmon, the same prosecutor involved in Cooper's case.  In *Jiminez*, Harmon testified that his file was open to defense counsel and all police reports should have been in his file prior to trial.  918 P.2d at 690.  When exculpatory police reports were discovered several years after trial, Harmon testified "even if he had had this information, he would not have felt a duty to disclose it to the defense." *Id.*  The Nevada Supreme Court reversed the defendant's conviction because of the prosecution's failure to provide the defense with police reports it found to be exculpatory and contain impeachment evidence against the informant witness. *Id.* at 695.

[9] Harmon was also the trial prosecutor in *State v. Bennett*, supra.

discovery request and the prosecution's inherent obligation to disclose exculpatory/impeachment evidence, known both to himself and/or others acting on his behalf, the information regarding Wells was not disclosed to the defense.

Harmon's *Brady/Giglio* obligation was not negated even if he had no personal knowledge that the investigators were told by Wells that he could not identify the shooter or knowledge of their efforts to have Wells testify falsely with promises of monetary compensation. Whether inadvertent or willful, material exculpatory/impeachment evidence regarding Wells was suppressed by the prosecution.

For the reasons outlined above, Cooper has demonstrated that the withheld information about Wells was both exculpatory and impeachment evidence and this evidence was suppressed by the State.

### 3.    The Evidence Was Material.

Because of the inter-related facts of Cooper's *Napue* and *Brady* claims, the materiality component for both claims will be addressed jointly in Argument, Section D, below.

### D.    Materiality Of Wells's Trial Testimony

The third requirement for both *Napue* and *Brady* violations is materiality. "[E]vidence is material if it might have been used to impeach a government witness, because if disclosed and used effectively, it may make the difference between conviction and acquittal … Evidence can be used to impeach a witness even if the evidence is not itself admissible,

24

even to impeach." *Paradis v. Arave*, 240 F.3d 1169, 1179 (9th Cir. 2001); *Horton v. Mayle*, 408 F.3d 570, 580 (9th Cir. 2005) (evidence that would have impeached witness who was central to the prosecution's case might well have altered outcome of the trial).

The Supreme Court uses the terms "materiality" and "prejudicial" interchangeably in cases. *Benn v. Lambert*, 283 F.3d 1040, 1053 n.9 (9th Cir. 2002). A *Napue* violation requires that the conviction be set aside whenever there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. *Giglio*, 405 U.S. at 154. A *Brady* violation is material when there is a reasonable probability that the result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 682 (1985).

In *Jackson v. Brown*, this Court described the different standards for assessing the materiality of *Napue* and *Brady* claims:

> [W]e first consider the *Napue* violations collectively and ask whether there is any reasonable likelihood that the false testimony **could** have affected the judgement of the jury. ... If so, habeas relief must be granted. However, if the *Napue* errors are not material standing alone, we consider all of the *Napue* and *Brady* violations collectively and ask whether there is a reasonable probability that ... the result of the proceeding **would** have been different.

513 F.3d at 1076 (emphasis in original) (internal quotations and citations omitted.)

25

Given the above standards, Wells's coached and false testimony could have affected the judgment of the jury and there is a reasonable probability that had this information been disclosed to the defense, the result of the trial would have been different.

The following facts/events demonstrate Wells's materiality to the State's prosecution of Cooper: (1)the prosecutor confirmed Wells's materiality at trial, (2)the prosecutor confirmed Wells's materiality during his deposition, (3)the trial court's questioning of Wells, and (4)defense counsel's inability to cross-examine Wells.

### 1. The Prosecutor Confirmed That Wells's Testimony Was Material.

During opening statements the prosecutor outlined the State's theory of the case. The prosecutor stated that the witnesses would testify as follows:

> Collier drove to the scene with his girlfriend, Debra Manor and two other females to buy sherm (a marijuana cigarette laced with PCP). Collier and Manor were talking to Williams when Cooper arrived at the scene in a car driven by his girlfriend Sharon Ragland. Cooper was in the front passenger seat and two unidentified males were in the backseat. Cooper called Williams and Collier over to his car. Williams was shot and killed by Cooper outside of Bruce's Liquor. Will Norman was shot in the hand by a stray bullet while standing inside Seven Seas Fish Market.

EOR 454-460.

Wells's testimony was important to the prosecution's case because if his testimony was discounted or discredited, the State had no credible witness to testify that Cooper shot Williams. With the exception of 69-year-old Norman, the purported eyewitnesses contradicted each other as well as contradicted their own prior statements/testimony.

The testimony of the pertinent witnesses is summarized below:

**Will Norman**, 69 years-old at the time of the incident, was working inside Seven Seas Fish market, cleaning up. EOR 753. He was standing by the bar, 15 feet inside the market, when he was hit in the hand by a bullet. EOR 754. He testified he didn't realize he had been shot as he thought a wire from his radio hit him. *Id*. Norman did not see who shot him. EOR 760.

**Jimmy Ray Thompson** testified he was riding his bike at the scene. EOR 537, 545. He saw four people in a car but could not tell if they were male or female. He could not identify the shooter. EOR 545, 553.

**Sharon Shawnette Ragland**'s trial testimony (which differed from her unsigned police statements), was actually one of four versions of events she provided the police and prosecution; her testimony was that she only heard a shot. EOR 597. Her disavowed unsigned police statement that she saw the shooting was given after she had been drinking (EOR 586) and after the police ransacked her home. EOR 596. Ragland stated she felt the police considered her a suspect for murder when she gave her second statement. EOR 597. She denied she told

27

police in either of her police statements that Cooper got out of the car and shot at Williams. EOR 584-585. She did not know if the two men in the back seat had guns. EOR 598.

Larry Collier and Debra Manor gave differing accounts in their police statements, preliminary hearing testimony and trial testimony. The only consistency was when they changed their account of what occurred, their changed accounts were also similar. *Compare* Collier's and Manor's police statements (EOR 1712, 1813), preliminary hearing testimony (EOR 268, 310) and trial testimony (EOR 631, 679).

**Larry Collier** testified at trial that he was at the scene buying sherm. EOR 636. Collier and Williams were together when they approached the car. He saw the gun and heard shots fired. EOR 643-645. Williams had not been shot at this point in time. Collier did not know if someone in the back seat of the car shot Williams. EOR 669. Collier acknowledged at trial "anybody could have been shooting". EOR 671. However in his police statement, Collier said he saw Williams running through the parking lot. EOR 1710-1711.

Collier told police he saw Cooper shoot Norman when Norman came outside of the market coming to the aid of Williams. EOR 1710. [Norman said he never came out of the market until the police arrived. (EOR 1880).] Collier said Cooper exited the car and chased Williams. EOR 1715. At the preliminary hearing Collier said he never told police he saw Cooper exit the car and chase Williams. EOR 294. At trial Collier did

not testify that Cooper got out of the car, but instead testified Cooper remained inside the car throughout the shooting. EOR 647. Defense counsel did not examine Collier about his inconsistent police statement.

**Debra Manor** testified at trial she came to the scene with her boyfriend (Collier) to buy sherm. EOR 681. She testified the person who shot Williams was in the back seat of the car: "I don't know who fired the shots and the only person that I seen with a gun was the guy sitting in the back seat." EOR 691. She said the only reason she had lied before, saying it was Cooper, was because she was mad that her cousin was shot. EOR 699-700. Manor admitted that her preliminary hearing testimony was "completely different" from the statement she gave the police (EOR 693).

At preliminary hearing, the prosecutor took Manor through her police statement. Manor told the police that Cooper was standing outside of the car when he shot Williams. EOR 1817. She also told police, as did Collier, that Norman was outside in the parking lot when he got shot. *Id.* "[T]he old man that works in the fish food store. He had come out to see what was going in [sic]. And after Ricky Cooper had shot Ricky Williams, he pointed the gun at the old man and shot him too." *Id.* Manor admitted at the preliminary hearing that she lied in her police statement. EOR 327-329.

**Donnell Wells** testified that he saw Cooper shoot at Williams from the moving car, the car then made a U-turn and as the car came back up

29

the street, Cooper shot at Williams again. EOR 726. Wells's testimony differed significantly from the testimony of other witnesses who testified that while they could not identify Cooper as the shooter, shots were fired while the car was stopped. Wells also testified that he saw Norman get shot with his hand on the front door of the market. EOR 718. Norman's testimony was he was 15 feet away from the door standing by the bar. EOR 754.

By the time the investigators brought Wells to court, the State's case was falling apart. The witnesses's testimonies were so unreliable that the prosecution had resorted to introducing portions of their unread and unsigned police statements to discredit the trial testimony of their own witnesses.

Wells was the only witness (with the exception of Norman) whose testimony the prosecution could embrace in whole cloth without having to resort to impeachment by prior inconsistent statements to support their theory of the case. Wells was not at the scene to buy and smoke sherm as were Collier and Manor. Wells had no prior inconsistent police statements or preliminary hearing testimony as did the other witnesses. Wells was not the victim's cousin (Manor (EOR 699-700)), nor did Wells do drugs with Williams and work with the victim's mother (Collier (EOR 1713, 1715)).

### a.  Prosecutor's Statements At The 1983 Trial.

Wells's materiality to the case is confirmed by the prosecutor's own words. *See Kyles v. Whitley*, 514 U.S. 419, 444 (1995) (The likely damage is "best understood by taking the word of the prosecutor"); *Horton v. Mayle*, 408 F.3d at 580 (noting the prosecutor's emphasis on the importance of the witness's testimony highlights how important the witness was to the case).

The prosecutor's emphasis on Wells's testimony during closing argument, uncorroborated by any other witness, belies the suggestion that Wells's testimony was not material. The prosecutor rejected the other witnesses's version of events (that the car was parked when shots were fired) and adopted Wells's version (that the car was moving): "But we have a case where a young eyewitness describes a car coming up the street and three shots are fired while the car is moving …." EOR 927. Wells alone testified that he saw Cooper shoot at Williams from a moving car and shoot at Williams again after the car made a U-turn (EOR 726), while other witnesses claimed to have heard shots fired while the car was parked.  EOR 646, 688, 690.

Furthermore, Wells's testimony was critical because it was the only testimony through which the State provided the jury with a motive for the shooting and could be used to establish premeditation.  Proclaiming Wells to be a "hero", the prosecutor also vouched for Wells's credibility.

31

### (1)  Motive

It was only Wells's testimony that provided a motive. Without objection from defense counsel, the prosecutor asked Wells:

> Q:   Donnell, Do you know why Ricky Cooper would shoot Ricky? Your friend Ricky?
>
> A:   Oh, I don't know for sure.  I saw him up there earlier.   They was in an argument or something.

EOR 729.  During rebuttal, the prosecutor told the jury: "Rickey Cooper had a motive to this, according to Donnell Wells" (EOR894); "Donnell Wells said that … he saw him fighting with the victim two or three hours before".[10]  EOR 893..

The jury was instructed regarding the role motive played in finding Cooper guilty.   Instruction No.17 (EOR 959), regarding malice aforethought provided:

> … The condition of the mind described as malice aforethought may … result from an unjustifiable or lawful motive or purpose to injure another, … .

Instruction No.25 (EOR 967), regarding intent also discussed motive:

---

[10] Out of the "three hundred or more" witnesses (EOR 467), who according to the police detective were present at the scene, Wells was the only witness to testify he had observed Cooper and the victim fighting earlier on the day Williams was shot.

> … Do not confuse intent with motive. Motive is what prompts a person to act. Intent refers only to the state of mind with which the act is done. Motive is not an element of the crime charged and the State is not required to prove a motive on the part of the defendant in order to convict. However, you may consider evidence of motive or lack of motive as a circumstance in this case.

Although motive is not a necessary element of the crimes charged, "it is material evidence that the jury may properly consider in deciding whether the defendant was the perpetrator of the crime." *Brown v. Borg*, 951 F.2d 1011, 1016 (9th Cir. 1991); *see also Benn v. Lambert*, 283 F.3d 1040, 1062 (9th Cir. 2002) (suppressed evidence was found to be material because it "would have substantially undermined the state's principal theory of motive").

Wells was the only witness to supply the material evidence regarding the prosecutor's theory of motive for the shooting.

### (2) Premeditation

During closing argument the prosecutor explained Cooper's premeditation by telling the jury that Wells testified he saw Cooper and Williams arguing, heard Cooper tell Williams: "I'll be back", and saw Cooper precisely aiming for Williams. EOR 729, 733, 743. No other eye-witness claimed to have heard this exchange. If the jury failed

to credit Wells's testimony, there was no evidence of Cooper allegedly threatening Williams.

The prosecutor disregarded the other witnesses' accounts of a parked car and adopted Wells's version of a moving car to establish this was a premeditated murder:

> Now what was this a case of: premeditation, is it first degree or second degree murder? … But we have a case where a young eye-witness describes a car coming up the street and three shots are fired while the car is moving and somebody is leaning across the driver to fire across he out the window with a rifle. …
>
> Donnell Wells said five shots altogether and he saw Ricky Williams clutch his chest. It appeared he was trying to run and he slipped and fell. What we have is murder by premeditation.

EOR 927-928. There is no doubt that Well's false testimony could have affected the jury and the outcome of the trial would have been different without the perjured testimony.

### (3)  Vouching

During rebuttal argument the prosecutor proclaimed Wells to be a "hero" for coming to court, contradicting the fact that Wells admittedly perjured himself and believed he was being paid for his testimony. The prosecutor argued:

> I happen to believe in heroes and there is a hero in this case. Nobody did what Mr. Wolf [defense counsel] said and sent him down here. There's a

> little 15-year-old guy who was subpoenaed. He got
> a subpoena that said you had to come to court and
> he came down here and stuck his neck out.[11]

EOR 920. The prosecutor assured the jurors they had no reason to doubt

Wells's credibility as defense counsel had suggested. *Id.*

The prosecutor's vouching for and extolling the virtues of Wells's

heroism for testifying against Cooper obscured the fact Wells did not see

who shot Williams, his testimony was coached and he testified under the

belief that he would receive money for his testimony. The prosecutor's

adoption of Wells's version of events and heavy reliance on Wells's

testimony serve as strong evidence of the prejudicial impact of Wells's

false testimony .

The prosecution's reliance on false evidence has been cited by this

Court as evidence of materiality. *See Hall v. Director of Corrections*, 343

F.3d 976, 984 (9th Cir. 2003) ("[I]n closing argument, the prosecutor urged

the jury to rely on false evidence as corroborating evidence of

[defendant's] guilt"); *Killian v. Poole*, 282 F.3d 1204, 1209 (9th Cir. 2002)

---

[11] Wells testified at the evidentiary hearing he did not receive a
subpoena. EOR 1332.

(in finding false testimony material, the Court notes the prosecution "took advantage of [the witness's] perjury" by relying on it in summation).

Aware of the problems it had with the other eyewitnesses, the prosecutor admitted his concerns with the State's witnesses to the jury during closing argument:

> If I could have sat down and written a script for this case, maybe I would have wanted witnesses a little different that Jimmy Thompson or Larry Collier. But as a prosecutor, I inherit the witnesses who happen to be there and to have the courage to come forward and to get involved.

EOR 919. It was during the prosecutor's acknowledgment of the other witnesses's "inconsistent version of events (EOR 918-919), that Wells was proclaimed a "hero". EOR 920. In Cooper's case, the prosecution used Wells's false testimony because it believed his testimony could affect the judgment of the jury and there was a reasonable probability that it would impact the outcome of the trial.

The force of the prosecutor's argument immeasurably enhances the impact of false evidence. "Evidence matters, closing argument matters; statements from the prosecutor matter a great deal." *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993). It cannot be said that one or more jurors would not have found a reasonable doubt as to Cooper's guilt

had the trial been free from Wells's false testimony. That information could not help but be central to the deliberations of any reasonable jury sorting through the contradictory testimony given by the different witnesses.

### b. Prosecutor's Testimony At The 2002 Deposition.

At his 2002 deposition, the trial prosecutor repeatedly stated how important Wells was to Cooper's prosecution:

> "Well I am 100 percent sure in this case that when I spoke with Mr. Wells because of who he was because of his importance in the case, I would have known he was there because I spoke with him I'm sure before he went to court.[12]  EOR 1515-1516.

> "He [Wells] was a very important witness." EOR 1520.

> "He [Wells] was one of the key witnesses in this case." EOR 1535.

The prosecutor's view of Wells as an "important" and "key witness" highlights the importance of Wells's testimony in Cooper's case.

---

[12] On the first day of trial, in response to defense counsel's renewed request for discovery regarding Wells, the prosecutor advised the court there was no discovery as he had not spoken to Wells prior to trial. EOR 435.  At trial Wells testified he first spoke with Harmon at 12:30p.m. on the same day that he testified. EOR 738.

### 2. Trial Court's Questioning Of Wells Demonstrates The Materiality Of Wells's Testimony.

The trial court's tendentious questioning of Wells was a contributing factor to the prejudice suffered by Cooper because of the State's *Napue* and *Brady* violations. Following the conclusion of Wells's testimony, the trial court bolstered Wells's credibility by canvassing him about his religious beliefs, asking: "Are you a religious young man?" and "Do you believe in God?" EOR 744. The court proceeded to conduct a lengthy inquiry regarding his failure to come forward with what he had seen earlier, asking Wells if it was because he was afraid that he had never come forward before. *Id.*

The court continued its provocative examination of Wells. The court appeared to be attempting to reconcile Wells' testimony that the car was moving when shots were fired with the previous testimony of other witnesses who testified that the car was parked when they heard shots fired.

| | |
|---|---|
| Court: | If I were to tell you that others have been in this court and testified that the car was parked when the shots were fired, would you think that incorrect? |
| Wells: | Well, from what I saw, the car was moving. |
| Court: | I see. But would you think that anyone else who might have testified that the car was parked and stopped, would you think they were in error? |
| Wells: | Yes. |

| Court: | I see.  And you did say that it was a young girl driving that car? |
|---|---|
| Wells: | Yes. |
| Court: | And you thought it to be a Ford? |
| Wells: | Yes. |
| . . . | |
| Court: | I would show you now – |
| Defense Counsel: | Your honor, may we approach the bench, please? |
| Court: | Yes. |

EOR 745.  Defense counsel finally interrupted and requested a side bar to object to the court's questioning of Wells.  *Id.*  Nevertheless, after the side bar, the trial court forged ahead with an extensive examination of Wells regarding the identification of the car and re-examining Wells by using the prosecutor's exhibits.  Defense Counsel again noted his "objection for the record" to the continued questioning by the court.  *Id.*

Wells was the only witness to be examined by the trial court in this manner.  Because of the trial court court's emphatic and thorough questioning of Wells, the importance of his testimony was not lost on the jury.

### 3.    Defense Counsel's Inability To Cross-Examine Wells

Since according to the prosecution, Wells was a very important and key witness for the State, Wells's coached and false testimony, the inducements for his testimony, his motivation to testify

and the failure of the prosecution to correct the false testimony, demonstrate that Wells's credibility was a material issue at trial. *Giglio*, 405 U.S. at 154-55 (The motivations of, and inducements given to, a witness are essential to assessing the witness's credibility.)

The prosecutor's declaration of Wells's heroism to come to court to testify (and the trial court's asking him if he didn't come forward sooner out of fear) made Wells appear brave and highly credible. However, the truth was the opposite of what was presented to the jury. Wells was not testifying because of selfless bravery. He was an easily manipulated child who was testifying to receive money. The prosecution's reliance on Wells's testimony during summation, inflated Wells's credibility by creating the "false impression that [the witness] was a good Samaritan [who was] volunteering to help the prosecution." *Jackson v. Brown*, 513 F.3d at 1077.

Wells's cross-examination would have been fundamentally different had his motivation to testify been disclosed. Because defense counsel was not aware that Wells's testimony was coached and he testified to receive money promised to him by the investigators, counsel's efforts at cross-examination and attempts to impeach Wells were brief, unprepared and ineffective. Furthermore, counsel's closing argument about Wells appeared to the jury to be just what it was – speculation as to Wells's truthfulness:

> Now he came forward later. He didn't come forward initially. Some time elapsed. Again look at his demeanor. He appeared to me like a young man who was attempting to tell what he was told to tell or told to believe.
>
> . . .
>
> I suggest he just didn't come forward. But I can visualize, using your common sense, using your inferences, that this boy was told to come in and being in line with what the police believed the truth to be, … was told to come and drop the dime on Rickey Cooper.

EOR 910-911.

Clearly defense counsel's hunch was correct. Wells did not see who shot Williams and instead was told to testify that Cooper was the shooter. Unfortunately, because this information was not disclosed to defense counsel, counsel's argument came across to the jury as mere conjecture. The prosecutor, on the other hand, took full and unfair advantage of the inaccurate portrayal of Wells as credible. EOR 920.

Wells's credibility would have been damaged if the jury had heard that his testimony was coached and false, and his motivation to testify was to receive money. Where the credibility of a witness is an important issue in the case, evidence of "**any understanding** or agreement … would be relevant to his credibility and the jury was entitled to know of it."

*Jiminez v. State*, 918 P.2d at 695 (emphasis in original), *quoting Giglio*, 405 U.S. at 155.

Disclosure of the agreement between Wells and the investigators could/would have allowed the jury to conclude that Wells had a motive other than heroism for testifying against Cooper. With regard to the money he would receive for testifying, Wells said that the investigators told him he would receive more money if they could use his testimony. "He said we're gonna give you some more. Your check will be better if you go on and do what we ask you to." EOR 1305; *see also* EOR 1334-1335. Such information is considered even more significant if the witness has not received a firm commitment from the prosecution because witnesses have a greater incentive to lie if the potential benefits are "not guaranteed". *Bagley*, 473 U.S. at 683.

Wells was a crucial witness. Any contention to the contrary is specious and a departure from the prosecutor's earlier concessions of same. EOR 1520, 1535. Because of the admission of false testimony/suppressed evidence, the prosecutor was able to argue Wells was a credible witness. The jury went into deliberations without knowing that Wells had a motive to lie. The exculpatory and impeachment

evidence of Wells's perjury and the State's inducement for him to commit perjury, combined with the inconsistent testimony of the other witnesses, would have been fatal to the prosecution's case. The circumstances regarding how Wells came to be a witness in Cooper's case was clearly relevant and material to the jury's deliberations.

## E.    Nevada Supreme Court Opinion

The Nevada Supreme Court ("NSC") was the last state court to issue an opinion and is therefore the focus of this Court's review.[13] *See Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991). In finding that Cooper's claims were procedurally defaulted, the NSC held:

> [E]ven if Wells falsely testified at trial that he clearly saw Cooper shoot Williams, Cooper still fails to overcome the procedural bars to raise this claim. He demonstrates cause for not raising the claim earlier since Wells's recantation revealed an impediment external to the defense and was not available until Wells spoke up. However, he does not demonstrate prejudice since Wells's description of the shooting at trial was not particularly convincing to begin with, while the other evidence of Cooper's guilt was strong.

EOR 104-105.

---

[13] The district court's Order denying Cooper's claims essentially adopted the findings of the Nevada Supreme Court, concluding that the state court opinion was not unreasonable. *See* EOR 6.

43

The federal district court acknowledged this Court's finding that pursuant to *Ake v. Oklahoma*, 470 U.S. 68 (1985), the NSC's decision did not rest on an adequate and independent state ground and did not bar federal habeas review. *Cooper v. Neven*, 641 F.3d at 333.

> According to the Ninth Circuit, the Nevada Supreme Court adjudicated Cooper's *Brady* and *Napue* related grounds (Grounds 1 and 2) on the merits in its March 2006 decision, when it addressed the claims in the context of determining whether Cooper could show cause and prejudice to excuse his procedural default of the claims.

EOR 13; *see also Cooper*, 641 F.3d at 332-33.

For the reasons outlined below, this Court should conduct *de novo* review of Cooper's *Napue* and *Brady* claims. To the extent that Cooper's claims, or specific portions of the claims were reviewed on the merits by the NSC, that court's decision was based on an unreasonable determination of the facts under §2254(d)(2), and was contrary to and/or an unreasonable application of clearly established federal law under §2254(d)(1).

## 1. The NSC Used The Wrong Standard Of Review.

As outlined above, Cooper has satisfied the requirements necessary to prevail on his *Napue* and *Brady* claims.

The materiality/prejudice standards for *Napue* and *Brady* are different, with the *Napue* standard being less stringent. Under *Napue*, the conviction may be set aside "whenever there is **any** reasonable likelihood that the false testimony **could** have affected the judgment of the jury." *Giglio*, 405 U.S. at 154 (emphasis added.) *Brady* materiality requires a "reasonable probability that the result of the proceeding **would** have been different." *Strickler v. Greene*, 527 U.S. 263, 290 (1999).

The NSC found that Cooper failed to establish materiality/prejudice since even if Wells's assertion that he did not see who the shooter was "is honest … the jury still would have convicted Cooper" (EOR 103), because "the other evidence of Cooper's guilt was strong." EOR 104-105. The NSC's finding, that despite Wells's false testimony that the evidence was sufficient to convict Cooper is inapplicable to a review of Cooper's *Napue* and *Brady* claims.

For *Brady*, the standard is not whether there is sufficient evidence of conviction, but whether there is a reasonable probability that the outcome would be different. *See Amado v. Gonzalez*, 758 F.3d 1119, 1139 (2014) ("Evidence can be sufficient to sustain a verdict, and still *Brady* can be violated."); *see also Kyles v. Whitley*, 414 U.S. at 434-35 ("*Brady*

does not ask, as in sufficiency of the evidence claim, whether the jury could have convicted. The question is whether the undisclosed evidence undermines confidence in the outcome.")

The courts apply an even "less demanding materiality standard to *Napue* errors". *Dow v. Virga*, 729 F.3d 1041, 1048 (9th Cir. 2013) ("*Napue* requires us to determine only whether the error **could** have affected the judgment of the jury, whereas ordinary harmless error review requires us to determine whether the error **would** have done so.") (emphasis in original).[14] In finding Cooper failed to establish materiality, the NSC applied the wrong standard for Cooper's *Napue* and *Brady* claims.

The standard for review appears to be in flux given a recent Supreme Court per curiam opinion. In *Wearry v. Cain*, 577 U.S. ____, 2016 WL 854158 (March 7, 2016), the Supreme Court reversed a conviction because of the prosecution's failure to disclose material evidence pursuant to *Brady*. In *Wearry*, instead of using the "reasonable probability" language, the Supreme Court used the *Napue* standard for analyzing the *Brady* claim, stating:

---

[14] "Once *Brady* and *Napue* claims are deemed material, there is no need for further harmless error analysis under *Brecht v. Abrahamson*, 507 U.S. 619 (1993) … ." *Jackson v. Brown*, 513 F.3d at 1076 n.11.

> Evidence qualifies as material when there is 'any reasonable likelihood' it could have 'affected the judgment of the jury.' *Giglio, supra* at 154 (quoting *Napue* …). … To prevail on his *Brady* claim, Wearry need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted. *Smith v. Cain,* 565 U.S. 73 … . He must show only that the new evidence is sufficient to 'undermine confidence' in the verdict. *Ibid.*

The Supreme Court further noted: "Given this standard, Wearry can prevail even if . . . the undisclosed information may not have affected the jury's verdict."

For the reasons outlined below, this Court should conduct a *de novo* review of Cooper's *Napue* and *Brady* claims because Cooper can overcome the threshold requirements of 2254(d)(1) or (2) because the NSC's reasoning was contrary to and/or an unreasonable application of clearly established federal law and/or it was based on an unreasonable determination of the facts. *See Paulino v. Castro*, 371 F.3d 1083, 1090 (9th Cir. 2004) (applying *de novo* review when state court employed rong legal standard).

Even, assuming *arguendo*, the applicability of AEDPA's standard of review to Cooper's claims, Cooper can satisfy AEDPA's deferential standard.

## 2. The NSC Overlooked And Misapprehended Material Facts And Questions Of Law.

Had the jury learned that Wells could not see who shot Williams, had told the investigators he could not see who shot Williams, believed he would receive money to testify against Cooper and then falsely testified at trial, it is difficult to imagine how his credibility would not have been negatively impacted.

The NSC misapprehended Wells's testimony with respect to his recantation and overlooked and minimized the impact Wells's testimony had on the jury.

The NSC hypothesized: "It is likely that jurors gave little weight to Well's account of the shooting because it was so at odds with the bulk of the evidence that Cooper shot from a parked car." EOR 103. Wells's testimony was at odds with the other witnesses, but it was Wells's version of events that the prosecutor argued to the jury.

This viewpoint contradicts the prosecutor's adoption of Wells's version that the car was moving to argue for a finding of premeditation during summation: "We have a case where a young eye-witness describes a car coming up the street and three shots are fired whiled the car is moving … ." EOR 927-928. The prosecutor's premeditation argument was based solely on Wells's false testimony.

Nor is it "likely" that the jury ignored Wells's testimony. It makes no sense for the prosecutor to rely on Wells's version of events and tell

the jury that Wells is a "hero" who "stuck his neck out" to testify against Cooper (EOR 920), if the prosecutor wanted Wells's testimony to be given "little weight" by the jury. The prosecutor's pronouncement of Wells's heroism made Wells appear to the jury as brave and highly credible. Instead, the jury was unaware of Wells's coached and false testimony.

Nor was the jury aware that Wells's motivation to testify was because he was promised money. If Wells's false testimony had not been presented to the jury, or alternatively, if Wells had testified truthfully and consistently with his recantation, the result of Cooper's trial would have been different. There is a reasonable likelihood that if the jury had been made aware that Wells testified falsely for monetary gain, their decision making process could/would have been different. Here, Wells's testimony bore upon his credibility as a witness as well as upon Cooper's guilt or innocence. *Napue*, 360 U.S. at 269-70 (quotations omitted.)

The NSC stated Wells's testimony that Cooper shot from inside a moving car was at odds with the "bulk of the evidence" that Cooper shot from a parked car. EOR 103. The court ignored that this "bulk of the evidence" came from the other witnesses's contradictory prior statements that were used by the prosecutor to impeach his own witnesses at trial.

The NSC disregarded Collier's inconsistent statement that Cooper got out of the car and chased Williams in the parking lot and then shot Norman outside in the parking lot after he shot Williams. EOR 1715-

49

17716.  Also disregarded by the court was Manor's statement that Cooper exited the car, stood over Williams, shot him, then shot Norman in the hand when Norman came outside the market to aid Williams.[15]  Sixty-nine year old Norman was clear that he was shot inside 15 feet inside the market standing by the bar.[16]  EOR 754.

Manor testified that she lied to the police when she said that Cooper shot Williams and Norman: "I lied to you.  You know, I lied and I told you I did.  I told you I didn't want to tell them that.  Now I want to tell the truth.  That's all I want to tell."  EOR 327-329.

The NSC overlooked Manor's testimony at trial that the person who shot Williams was in the back seat of the car: "I don't know who fired the shots and the only person that I seen with a gun was the guy sitting in the back seat."  EOR 691.  Manor said the reason she had lied before was because she was angry that her cousin was shot.  EOR 699-700.

---

[15] Collier and Manor contacted the police the day after the shooting and gave nearly identical statements.  EOR 1709, 1810.  When both changed their stories at preliminary hearing and trial, their changed version of events were also nearly identical. *See* EOR 268, 310, 631, 679.

[16] It was also the State's theory of the case that Norman was shot by a stray bullet while standing inside the bar.  EOR 454-460.

If the jurors gave little weight to Wells's testimony in reaching a verdict, that would contradict the prosecutor's rejection of the other witnesses's versions of events and adoption of Wells's version in closing argument. It also contradicts the prosecutor's emphasis on Wells's importance during summation. If one of the jurors did give weight to Wells's testimony, as the prosecutor implored them to do, it is reasonable to believe that that the jury took into consideration Well's false testimony.

Without Well's perjured testimony, there was no direct testimony given at trial by any witness that saw Cooper shoot Williams, nor was there any other testimony given that would demonstrate premeditation or a motive for the shooting. The NSC stated that Wells did not recant his testimony indicating that Cooper had a motive to shoot Williams. EOR 102. The NSC cherry-picked a portion of Wells's testimony that it chose to find believable – that there had been a previous confrontation between Cooper and the victim. Yet, at the same time, the court stated that Wells's testimony was so at odds with the bulk of the testimony that the jury likely gave it little weight. EOR 103.

Wells's testimony of a prior altercation demonstrates the materiality of his testimony as it was used by the prosecution to establish premeditation and motive. The NSC surprisingly gave credence to Wells's testimony regarding the alleged fight,[17] while opining that other parts of Well's trial testimony was "questionable" and "not particularly convincing to begin with". EOR 102-103. If as opined by the NSC that Wells's description of the shooting wasn't particularly convincing, there would have been no reason for the prosecutor to adopt Well's version of a moving car during summation, to the exclusion of the other version of events given by the State's other witnesses.

Neither was the importance of Wells's testimony lost on the trial court. The trial court's extraordinary and rehabilitative questioning of Wells following his testimony further demonstrated the materiality of Wells's testimony. The NSC stated that Cooper mischaracterized the trial court's protracted questioning of Wells after his testimony failed to coincide with the testimony of the other purported eyewitnesses. EOR 103-104. The court overlooked that the trial court did much more than

_____

[17] None of the other "three hundred or more" witnesses at the scene (EOR 467), ever mentioned to the police that Cooper and Williams had a prior altercation on the day of the shooting,

just question Wells regarding telling the truth and his religious beliefs. The trial court conducted extensive examination of Wells in an attempt to reconcile Wells's contradictory statements that the car was moving when the shots were fired with the other witnesses statements who testified that the car was parked. Even after defense counsel objected, the trial court persisted in showing exhibits and photos to Wells, repeatedly asking him if the other witnesses could be wrong that the car was moving when shots were fired. The trial court did not conduct such an examination with any other witness.

The evidence that Wells was told to testify that Cooper was the shooter in exchange for money and he did not see Cooper shoot Williams was certainly material to assessing Wells's credibility and the veracity of his testimony. The NSC disregarded the uncontradicted evidence that Wells believed that he was being offered "money" in exchange for his testimony against Cooper.

That the $75.00 Wells received could be portrayed or seen as a legitimate witness fee does not resolve the issue nor negate the basis of Cooper's claim. Whether or not Wells was entitled to a $75.00 witness fee (which the D.A. investigator relentlessly tried to convince him of in 2001

before he was to testify at the evidentiary hearing), is not the point. The point is Wells's subjective belief of receiving money if he testified against Cooper. The receipt of the money corroborates his recantation testimony that he received money after he testified how the State wanted him to testify. Wells was 15 years old. It is doubtful that he was aware that he was entitled to a $25 a day witness fee.

The NSC stated that "the discrepancy between Wells's trial testimony and the other evidence regarding the shooting suggests that the investigators did not coach that testimony". EOR 103-104. However, the court misapprehended the sequence of events that led up to Wells's trial testimony. The discrepancies between Wells' testimony and that of Collier, Manor and Norman indicates Wells was in fact coached.

Wells's trial testimony does not match Norman's because Norman testified the day after Wells (November 4th). Wells' trial testimony does not match Collier's and Manor's trial testimony, but it does match both Collier and Manor's (unread and unsigned) police statements that were introduced at trial. This is because the investigators were not present during Collier and Manor's trial testimony, so they could not coach Wells as to Collier and Manor's trial testimony. The investigators did not know

54

that at trial Collier and Manor testified inconsistently with their police statements, to the point where the prosecutor introduced their unsigned police statement into evidence in an attempt to maintain the State's theory of the case. The investigators were picking up Wells and Wesley from school to bring them to court during the time that Collier and Manor were testifying on November 3rd. *See* EOR 1358, 438.

At trial the prosecution was able to switch between the witnesses's various police statements, preliminary hearing testimony, and trial testimony to select the version which best fit the State's theory of defense. Likewise, the NSC cherry-picked which of Wells's statements it chose to find credible and those which it found to be incredible. In addition, certain portions Collier and Manor's testimony was perceived as accurate by the NSC, yet other contradictory statements were simply ignored.

The NSC noted the state district court, in its order, said that "Harmon refuted Wells's allegation of a pretrial practice session." EOR 102. This statement is misleading. What Harmon refuted, to the extent it can be labeled a refutation, was his personal involvement in a pretrial practice session with Wells at court prior to Wells's testimony. EOR

1366-1367.  This is consistent with representations made both by Wells and Harmon.

At the evidentiary hearing, Wells did not testify that the prosecutor was in the hallway when the investigators were coaching him as to how to testify and to say that Cooper was the shooter. Nor did Wells testify that the prosecutor was aware that the investigators had promised Wells "money" if he testified in the manner they wanted him to.  Wells's uncontradicted and unrebutted testimony is that it was the district attorney investigators who were present while he was being coached how to testify.  Wells's testimony at the 1983 trial was that the day he testified in court was the "first time" he spoke with Harmon at approximately 12:30 p.m.  EOR 738.

At the evidentiary hearing, Harmon (although having no specific memory) testified that it was his practice to interview a witness and that he "probably did talk to him [Wells] during the lunch break ...".  EOR 1428.  Harmon's evidentiary hearing testimony did not disprove any of Wells's testimony.  Harmon's testimony that he or an investigator talked with Wells at least three times prior to Wells taking the stand, since

Wells was coincidentally paid for three days of testimony, was pure speculation.

> Q: So would I be correct sir, in indicating that you don't know whether you learned about Mr. Wells a day before, 10 hours before; it could have been the same day, correct?
>
> A: Well, it was not the same day because I signed off on a payment for three days.
>
> Q: I understand that sir, but you don't have any independent recollection, correct?
>
> A: No I don't.
>
> Q: So you don't know when you first learned about Mr. Wells; is that accurate?
>
> A: I do not know.

EOR 1379-1380. On the first day of trial, prior to jury selection, Harmon advised the court that he got Wells's name from William's family, but had not yet "spoken personally" to Wells. EOR 435.

The NSC concluded that "it appears that Wells was simply paid witness fees for his trial appearance and pretrial meetings with investigators." EOR 103. Even, assuming

*arguendo*, that the court's assessment that Wells was simply paid witness fees is accurate, that does not resolve the issue. The NSC disregarded the uncontradicted evidence that Wells

believed that he was being offered "money" in exchange for his testimony against Cooper. It was Wells's subjective belief that even though he could

57

not identify the shooter, if he testified that Cooper had shot Williams he would receive the money. Wells was a 15-year-old ninth grader, pulled out of school without his parents' knowledge. He knew nothing about a state statutory right to witness fees. He did know, however, that it cost money to buy name-brand jeans and tennis shoes.

Despite Wells's unequivocal recantation, the NSC found that "the investigators did not act improperly". EOR 104. The record indicates otherwise. Some 18 years after the trial, the State persisted in its efforts to influence Wells's testimony and to convince him that the money he received was a legitimate witness fee. The NSC did not acknowledge or explain why the D.A. investigator felt it necessary in Wells's 2001 interview to pressure Wells to influence his evidentiary hearing testimony.

During the interview, Wells told D.A. Investigator Hill he could not see who fired the shots (EOR 1307) and D.A. investigators (Eddie Shield and Olan Rakes) coached him how they wanted him to testify. Investigator Hill repeatedly told Wells he had not been coached. EOR 1308-1309. When Wells said that he was told that he would receive more money than he was entitled to (*id*), the investigator told Wells he had

merely received a legitimate witness fee in conformance with the laws of

the State of Nevada, using the word "legitimate" and "witness fee" exactly

31 times. EOR 1303-1305, 1308-1313, 1319. The investigator then chose

to threaten Wells:

> … Now, if you want to be a part of this nonsense
> that Rickey is about to throw up in the court's face,
> that's fine, but I want you to be aware that if you
> get up and you perjure yourself, now you are going
> to be looking, I'm not threatening you, but I'm
> telling you what the practical aspect of this is.

EOR 1312. Despite obvious pressure and threats, Wells's evidentiary

hearing testimony remained consistent with his recantation statement.

Wells believed that he would only get the "money" if he testified that

Cooper was the shooter. EOR 1335-1336.

Wells being provided payment for a pre-trial interview is a separate

problem. Harmon testified and indicated that he didn't know what

"pretrial practice" was (EOR 1366), but that neither he or his "staff" did

"that." (*Id.*) Yet Harmon testified that either he or his investigators met

with Wells three times before he testified (EOR 1373), justifying the

three-day witness fee payment to Wells. Harmon's initial testimony that

his office did not engage in that practice, is indicative of a discomfort with

the district attorney's practice of paying witness fees to witnesses for pretrial interviews.[18]

Regardless of the legality or ethical concerns regarding the district attorney's payments to witnesses for pretrial conferences, "[p]ayments to witnesses are *Brady* material", as are "[c]ooperation agreements". *United States v. Acosta*, 357 F.Supp.2d 1228, 1243 (D.Nev. 2005) ("Simply because 'material' failures to disclose exculpatory evidence violate due process does not mean only 'material' disclosures are required. Whether evidence is 'useful', 'favorable', or 'tends to negate the guilt or mitigate the offense' are semantic distinctions without a difference in the pretrial context.") *Id.* at 1232-33.

The NSC's finding that Wells simply received witness fees, the implication being that he received nothing in exchange for his testimony, is belied by the record. "Evidence of potential payment would challenge the veracity both of [a witness's] direct testimony and of their substantive

---

[18] The Clark County District Attorney Office's long-standing practice of witness fee payments for pretrial conferences has recently ended, following a strong public outcry. *See Las Vegas Sun*, February 13, 2009 "Controversy erupts over prosecutors paying witnesses for interviews"; *Las Vegas Sun*, November 16, 2013 "Witness appearances fees come to an end"; *Las Vegas Sun*, November 18, 2013 "DA does 180 on paying witnesses".

cross-examination testimony. *Bagley v. Lumpkin*, 798 F.2d 1297, 1301 (9th Cir. 1986). The prosecution was required to turn over to the defense all material information casting a doubt on Wells's credibility. *See Brady*, supra; *Giglio*, supra.

With regard to the prosecution's use of Wells's false testimony to convict Cooper, the NSC's inapplicable sufficiency of the evidence analysis was contrary to an unreasonable application of *Napue* and was based on an unreasonable determination of the facts. *See Jackson v. Brown*, 513 F.3d at 1071. Even if the NSC had correctly applied the correct standard of review, the court's determination that Wells's testimony was not material does not withstand review. "[A] government's assurances that false evidence was presented in good faith are little comfort to a criminal defendant wrongly convicted on the basis of such evidence." *U.S. v. Young*, 17 F.3d 1201, 1203 (9th Cir. 1994).

To the extent that the NSC determined that the prosecution's failure to inform Cooper of Wells's recantation, and the coercive nature of his trial preparation which included (but was not limited to) an undisclosed financial reward for his testimony, was not *Brady* material, it unreasonably applied and was contrary to clearly established Supreme

61

Court precedent and based its finding on an unreasonable determination of the facts.

In concluding that Cooper did not demonstrate prejudice, because it was "likely that jurors gave little weight to Wells's account of the shooting" (EOR 103), the NSC inappropriately made an independent factual determination about what "likely" occurred. However, not discussed by the court is that the prosecution took a very different position at trial. The prosecution's heavy reliance on Wells's version of events, and their emphasis on his credibility and heroism, demonstrates otherwise. Contrary to the standard of review used by NSC, Cooper "does not need to prove that a different result would have occurred in this case. He needs to show only that the new evidence is sufficient to undermine confidence in the outcome. Cooper has met this standard.

## VII.
## CONCLUSION

Cooper has demonstrated that he is entitled to relief pursuant to *Napue* and/or *Brady*. For the reasons stated in this Opening Brief, he respectfully asks this Court to reverse the district court's judgment and order denying the writ and order that Cooper be granted a new trial.

## VIII.
## STATEMENT OF RELATED CASES

Counsel for Petitioner-Appellant is unaware of any related case pending at either the trial or appellate level.

## IX.
## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,995 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word and Century 14-point font.

Dated this 7th day of March, 2016.

Respectfully submitted,

*/s/ Megan C. Hoffman*
MEGAN C. HOFFMAN
Assistant Federal Public Defender

*/s/ Danice Arbor Johnson*
DANICE ARBOR JOHNSON
Research and Writing Attorney

63

## CERTIFICATE OF SERVICE

| | |
|---|---|
| RICKEY COOPER,<br><br>   Petitioner/Appellant,<br><br>vs.<br><br>E.K. MCDANIEL, et al.,<br><br>   Respondents/Appellees. | CA No. 15-15755<br><br>D.C. No. 3:97-cv-00222-JCM-WGC<br>(District of Nevada, Reno |

I hereby certify that on March 7, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing documents by First-Class Mail, postage pre-paid, or have dispatched it to a third party commercial carrier for delivery within three calendar days, to the following non-CM/ECF participants.

ADDRESSEES:

Participants:
Robert E. Wieland
Senior Deputy Attorney General
5420 Kietzke Lane, Suite 202
Reno, NV 89511

Non-Participants:
Rickey Cooper, #19118
Southern Desert Correctional Center
P.O. Box 208
Indian Springs, NV 89070

*/s/ Adam Dunn*
An Employee of the
Federal Public Defender