No. 15-15755

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

RICKEY DENNIS COOPER

                Petitioner-Appellant,

    vs.

ELDON K. MCDANIEL

            Respondents-Appellees

3:97-cv-0222-JCM-WGC
(Nevada, Reno)

**RESPONDENTS-APPELLEES' ANSWERING BRIEF**

ADAM PAUL LAXALT
Attorney General
ROBERT E. WIELAND
Nevada Bar No. 890
Senior Deputy Attorney General
100 North Carson Street
Carson City, NV 89701
Telephone: (775) 684-1265

RENEE VALLADERES
Federal Public Defender
MEGAN C. HOFFMAN
Assistant Federal Public Defender
411 E. Bonneville Ave., Ste. 250
Las Vegas, NV 89101
Telephone: (702) 388-5178

# **TABLE OF CONTENTS**

TABLE OF CONTENTS.......................................................................... i

TABLE OF AUTHORITIES ............................................................ii-iv

I. STATEMENT OF JURISDICTION ...................................................1

II. STATEMENT OF ISSUES PRESENTED ..........................................1

III. STATEMENT OF THE CASE......................................................2

IV. DENIAL OF FACTUAL ALLEGATIONS .....................................8

V. STANDARD OF REVIEW ...........................................................8

VI. ARGUMENT…………………………………………………..12

      A.    The Federal District Court Correctly Determined that Cooper is Not Entitled to Federal Habeas Relief on Ground 1, the *Napue* Claim……………… 12

      B.    The Federal District Court Correctly Denied Cooper Federal Habeas Relief on Ground 2……………………………………………………..34

      C.    As the Nevada Supreme Court Held, the Evidence Against Cooper Is Overwhelming. Therefore, Any Error Is Harmless……………….……48

VII. CONCLUSION ......................................................................53

VIII. STATEMENT OF RELATED CASES ......................................54

CERTIFICATE OF COMPLIANCE........................................................55

CERTIFICATE OF SERVICE ..........................................................5

i

# <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*Allen v. Woodford*, 366 F.3d 823 (9th Cir. 2004)……………………………….30, 31

*Bell v. Cone*, 535 U.S. 685 (2002)…………………………………………………..10

*Boyd v. Allen*, 592 F.3d 1274 (11th Cir. 2010)…………………………………...29

*Brady v. Maryland*, 373 U.S. 83 (1963)………………..1, 5, 6, 8, 13, 23, 31, 34, 40

*Brecht v. Abrahamson*, 507 U.S. 619 (1993)……………………………………33, 53

*Cacoperdo v. Demosthenes*, 37 F.3d 504 (9th Cir. 1994)……………………33, 48

*Callier v. Warden*, 111 Nev. 976, 901 P.2d 619 (1995)…………………………..27

*Carey v. Musladin*, 549 U.S. 70 (2006)……………………………………………...12

*Carothers v. Rhay*, 594 F.2d 225 (9th Cir. 1979) …………………………….28, 30

*Cooper v. Neven*, 641 F.3d 322 (9th Cir. 2011)……………………… 7, 12, 34, 42

*Cullen v. Pinholster*, 131 S.Ct. 1388 (2011)……………………………….…12, 28

*Davis v. Ayala*, 135 S.Ct. 2187 (2015)………………………………………..35, 53

*Early v. Packer*, 537 U.S. 3 (2002)..………………………………………...10, 11, 44

*Giglio v. United States*, 405 U.S. 150 (1971) …………………………...5, 6, 34, 42

*Gonzalez v. Wong*, 667 F.3d 965 (9th Cir. 2011)………………………………...30

*Hall v. State*, 91 Nev. 314, 535 P.2d 797 (1975)………………………………….26

*Harrington v. Richter*, 131 S.Ct. 770 (2011)…………………………12, 29, 33, 48

*Hayes v. Brown*, 399 F.3d 972 (9th Cir. 2005)………………………………27, 32

*Hysler v. Florida*, 315 U.S. 411(1942)……………………………………………30

*Jackson v. Brown*, 513 F.3d 1057 (9th Cir. 2008)……………………………31, 23

*Kane v. Garcia Espitia*, 546 U.S. 9 (2005)……………………………………..10

*Kyles v. Whitley*, 514 U.S. 419 (1995)…………………………………...…...32

*Lindh v. Murphy*, 521 U.S. 320 (1997)…………………………………......10

*Lockyer v. Andrade*, 538 U.S. 63 (2003)…………………………………..9

*Marshall v. Rodgers*, 133 S.Ct. 1446 (2013)…………………………………...28

*Mazzan v. Warden*, 116 Nev. 48, 993 P.2d 25 (2000)…………………………23

*Morales v. Woodford*, 336 F.3d 1136 (9th Cir. 2003)………………………...28, 29

*Murtishaw v. Woodford*, 255 F.3d 926 (9th Cir. 2001)……………………….…..28

*Napue v. Illinois*, 360 U.S. 264 (1959)……………………………1, 5, 6, 8, 27, 30, 34

*Pavao v. Cardwell*, 583 F.2d 1075 (9th Cir. 1978)……………………………..28

*Penry v. Johnson*, 532 U.S. 782 (2001)…………………………………………..47

*Reddick v. Haws*, 120 F.3d 714, 718 (7th Cir. 1997)…………………………..30

*Richardson v. Marsh*, 481 U.S. 200 (1987)…………………………………47

*Sass v. California Board of Prison Terms*, 461 F.3d 1123 (9th Cir. 2006)……….11

*Shackleford v. Hubbard*, 234 F.3d 1072 (9th Cir. 2000)…………………………11

*United States v. Agurs*, 427 U.S. 97 (1976)………………………………...31, 44

*U.S. v. Bagley*, 473 U.S. 667 (1985)…………………………………….……34, 43

*United States v. Wicker*, 933 F.2d 284 (5th Cir. 1991)……………….………...46

*Wadlington v. U.S.*, 428 F.3d 779 (8th Cir. 2005)………………………………..30

*Williams v. Taylor*, 529 U.S. 362 (2000)………………………………… 9, 10, 11

*Woodford v. Visciotti*, 537 U.S. 19 (2002)………………………………….……..10

*Ybarra v. McDaniel*, 656 F.3d 984 (9th Cir. 2011)………………………………28

*Ylst v. Nunnemaker*, 501 U.S. 797 (1991)………………………………….……..11

## CODES

28 U.S.C. § 2253(c)(3)……………………………………………………………..1, 8

28 U.S.C. § 2254…………………………………………………………………..3, 27

28 U.S.C. § 2254(d)……………………………………………...1, 9, 10, 11, 35, 41

28 U.S.C. § 2254(d)(1)……………………………………………………10, 28, 44

28 U.S.C. § 2254(e)(1)……………………………………………......9, 29, 35

## STATUTES

NRS 34.726(1)…………………………………………………………………....4

NRS § 50.225…………………………………………………………………..46

## OTHER AUTHORITIES

Anti-Terrorism and Effective Death
  Penalty Act of 1996 (AEDPA)………………………………1, 8, 9, 12, 27, 28, 34

9th Cir. R. 22-1(e)………………………………………………………………..1, 8

9th Cir. R. 32-1……………………………………………………………………55

# I. **STATEMENT OF JURISDICTION**

This Court issued an order in which it granted a certificate of appealability with respect to the following:  Whether the State violated appellant's right to due process under *Napue v. Illinois*, 360 U.S. 264 (1959), or *Brady v. Maryland*, 373 U.S. 83 (1963).  *See* 28 U.S.C. § 2253(c)(3); *see also* 9th Cir. R. 22-1(e).  EOR 1.

# II.    **STATEMENT OF ISSUES PRESENTED**[1]

1.     Whether the Nevada Supreme Court's adjudication of Cooper's claim that his conviction was based on false testimony as shown by the purported recantation of witness Donnell Wells in violation of his Fifth and Fourteenth Amendment rights to due process and a fair trial resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. (The *Napue* claim in Ground 1).

2.     Whether the Nevada Supreme Court's adjudication of Cooper's claim that the prosecution failed to produce material evidence, allegedly the failure to advise the defense of promises of money made to Donnell Wells in exchange for his testimony, Docket #51 at 18-21, but which is in actuality, that Wells was paid

---

[1] This appeal is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  The issues upon which the certificate of appealability has been granted are misstated.  The issue must be stated in terms of the AEDPA, that is, within the terms of 28 U.S.C. § 2254(d).

1

$75 in witness fees at $25 per day for each of the three days he appeared to testify, resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. (The *Brady* claim in Ground 2).

## III.   STATEMENT OF THE CASE

Following a jury trial in November 1983, Petitioner-Appellant Rickey Dennis Cooper (Cooper) was found guilty of attempted robbery with the use of a deadly weapon, attempted murder with the use of a deadly weapon, battery with the use of a deadly weapon, and first-degree murder with the use of a deadly weapon. EOR 157-158.

In May, 1986, the Nevada Supreme Court dismissed Cooper's direct appeal. EOR 154-156.

In December, 1986, Cooper filed a state petition for post-conviction relief after which he filed an amended petition which was denied in November, 1987. EOR 118; EOR 2075, Docket #7, Exhibits 33, 34, 39, and 40. In September, 1988, the Nevada Supreme Court dismissed Cooper's appeal. EOR 118; 147-153.

In July, 1990, Cooper filed a petition for writ of habeas corpus (post-conviction) which was dismissed. EOR 144. In June, 1991, the Nevada Supreme

Court dismissed Cooper's appeal. EOR 144-146.

In 1993, Cooper filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the District of Nevada in Case No. CV-N-93-685-DWH(RJJ).[2] Cooper filed an amended federal petition. The federal district court granted Respondents' motion to dismiss and entered judgment on February 29, 1996.

In January, 1997, Cooper filed an original petition for writ of habeas corpus in the Nevada Supreme Court. EOR 143. The court denied the petition holding that a petition for writ of habeas corpus must first be filed in the appropriate state district court and that Cooper could then appeal from an adverse decision. *Id.*

On April 23, 1997, Cooper filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court in Case No. CV-N-97-222-DWH(RAM). EOR 2075, Docket #4. In July, 1997, Cooper filed an amended petition. In response to Respondents' motion for compliance and for a more definite statement, Cooper filed a second-amended petition. EOR 2076, Docket ##17, 23. Respondents moved to dismiss the second-amended petition arguing that none of the grounds were exhausted. EOR 2076, Docket #28. The federal district court found that none of the claims were exhausted and dismissed the petition. EOR 2077, Docket ## 37 and 41. Judgment was filed February 24, 1999. EOR

---

[2] Pursuant to Fed.R.Evd. 201, Respondents request this Court take judicial notice of the proceedings in that case.

2077, Docket #42.

In August, 1997, Cooper filed yet another state petition for writ of habeas corpus (post-conviction). EOR 118, 1100-1132. The State opposed the petition. EOR 118, 1133-1141. The state district court denied the petition. EOR 118, 1145-1148.

Cooper appealed. On July 24, 2000, the Nevada Supreme Court found that the petition was filed more than 11 years after remittitur issued from his direct appeal and, citing NRS 34.726(1), found that the petition was untimely and successive. EOR 130; EOR 99 & fns. 26 and 27. The court held that the petition was procedurally barred absent a demonstration of cause and prejudice. EOR 130; EOR 99 & fn. 28. The court also noted that because the State had pleaded laches, Cooper was required to overcome a rebuttable presumption of prejudice to the State. EOR 130; EOR 99 & fn. 29. The court affirmed the district court's judgment except in regard to Cooper's claim that a witness to the murder, Donnell Wells, had recanted his trial testimony and alleged that he had been pressured and paid to testify. EOR 130; EOR 89. The court concluded that that claim, if true, might provide cause to excuse procedural defects and entitle Cooper to relief. EOR 132-133. With respect to the remaining contentions, the court concluded that Cooper had failed to demonstrate cause or prejudice to excuse the procedural defects, and remanded the matter for an evidentiary hearing. EOR 132 at fn.1; 90

& fn.7.

After conducting an evidentiary hearing, the state district court found Cooper failed to establish cause and prejudice. EOR 119, 125-128, 1220-1227; 1320-1437.

Cooper again appealed claiming the district court's decision that Cooper's petition was procedurally barred was error because Cooper established good cause and prejudice. EOR 88-106. Cooper argued he had shown cause by showing "*Brady*/*Giglio*/*Napue* violations (the purported withholding of exculpatory evidence, the presentation of false evidence, and the vouching for Wells's perjured testimony. EOR 2082, Docket #65, Exhibit 117 at ii. Cooper argued he had shown cause by virtue of Wells's recantation of his trial testimony and, that by finding that Wells's recantation was incredible, the court necessarily acknowledged a recantation occurred and, the mere fact that a recantation occurred constituted cause. *Id.* Cooper argued his demonstration of cause and prejudice necessarily established that he was entitled to state habeas relief. Cooper argued 1) the state district court conducted an inadequate in-camera inspection of the prosecutor's trial file; 2) the practice of having the prevailing party draft the order for the court violated his state and federal due process rights; and 3) the court abused its discretion by denying in part Cooper's motion to alter, amend or clarify the judgment. EOR 2082, Docket #65, Exhibit 117 at iii.

In March, 2006, the Nevada Supreme Court affirmed the denial of Cooper's state petition. EOR 88-106.

The federal district court granted Cooper's motion to re-open Case No. CV-N-97-0222-DWH(RAM). EOR 2080, Docket #45; EOR 2081, Docket #50.

In November, 2006, Cooper filed a third-amended petition for writ of habeas corpus in which he presented ten grounds, only two of which are pertinent to this appeal. Therein, as Ground One, Cooper claimed that his conviction was based on false testimony in violation of his Fifth and Fourteenth Amendment rights to due process and a fair trial as shown by the recantation of witness Donnell Wells. EOR 167. Cooper, citing Exhibits 73, 117 and 119, claimed that he presented this claim in his third state court post-conviction petition. EOR 167.

As Ground Two, Cooper claimed that the prosecution failed to produce material evidence regarding witness Donnell Wells in violation of his rights to due process, a fair trial and equal protection under the Fifth and Fourteenth Amendments, and in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1971); and *Napue v. Illinois*, 360 U.S. 264 (1959). EOR 176. Cooper, citing Exhibits 73, 117, and 119, stated that he presented this claim in his third state post-conviction petition. EOR 167.

The federal district court granted Respondents' motion to dismiss. EOR 2085, Docket #91. The district court found Respondents' procedural default

arguments to be dispositive and did not address Respondents' remaining arguments. EOR 2085, Docket #91. The federal district court declined to grant a certificate of appealability, however, the Ninth Circuit Court of Appeals did so on the issue "Whether the district court properly dismissed appellant's third-amended petition as procedurally barred." EOR 2085, Docket ##91 and 98.

The court of appeals affirmed in part and reversed in part. *Cooper v. Neven*, 641 F.3d 322, 331 (9th Cir. 2011). This Court reversed the district court's dismissal of Cooper's *Brady* and *Napue* claims, which correspond to Grounds 1 and 2, respectively, on the basis they were procedurally barred. *Cooper v. Neven*, 641 F.3d 322, 331 (9th Cir. 2011).

 This Court also stated that the district court would have to address Respondents' timeliness arguments before it could grant relief on any of those claims. *Cooper v. Neven*, 641 F.3d 322, 328 (9th Cir. 2011).

The United States Supreme Court denied Respondents' petition for writ of certiorari. EOR 2086, Docket #110.

The district court denied Respondents' motion to dismiss the surviving grounds, Grounds 1, 2, 7(A)(3), 8(5), and 8(3). EOR 35-58, EOR 2088, Docket ##121, 124, and 131.

With respect to Grounds 1 and 2, the district court found that they were exhausted in Cooper's third state post-conviction petition and that inherent in this

Court's ruling is the fact that the Nevada Supreme Court reviewed Grounds 1 and 2 on the merits, in order to make a determination that the claims were defaulted, citing Exhibit 124 at 12-18. EOR 52. Furthermore, the district court reached a similar conclusion with respect to Ground 2, finding the Nevada Supreme Court ruled on the merits of the *Brady* claim in Ground 2. EOR 55.

The federal district court denied relief, denied a certificate of appealability, and entered its judgment on March 17, 2015. EOR 5, 6-35.

This Court granted a certificate of appealability with respect to the following issues: Whether the State violated appellant's right to due process under *Napue v. Illinois*, 360 U.S. 264 (1959), or *Brady v. Maryland*, 373 U.S. 83 (1963). *See* 28 U.S.C. § 2253(c)(3); *see also* 9th Cir. R. 22-1(e). EOR 1.

## IV. DENIAL OF FACTUAL ALLEGATIONS

Respondents deny each and every factual allegation contained in Cooper's third-amended petition and in his opening brief save and except for those which have expressly been found to be true by a Nevada court of competent jurisdiction.

## V. STANDARDS OF REVIEW

This action is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 (hereinafter AEDPA).

/ / /

/ / /

28 U.S.C. § 2254(d) states:

> (d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
>> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(e)(1) states:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

The AEDPA "placed a new restriction on the power of the federal courts to grant writs of habeas corpus to state prisoners."  Williams v. Taylor, 529 U.S. 362, 399 (2000).   Williams now sets forth the AEDPA standard of review of merits determinations.  The Supreme Court previously recited that § 2254(d) created a "new highly deferential standard for evaluating state court rulings."  *Lockyer v.*

*Andrade*, 538 U.S. 63 (2003); *Early v. Packer*, 537 U.S. 3 (2002); *Woodford v. Visciotti*, 537 U.S. 19 (2002); *Lindh v. Murphy*, 521 U.S. 320, 334 n.7 (1997).

Section 2254(d)(1)'s "clearly established" phrase refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision. *Williams v. Taylor*, 529 U.S. 362, 412 (2000). Furthermore, it is a necessary condition for federal habeas relief that the state court's decision be "contrary to, or involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). *Kane v. Garcia Espitia*, 546 U.S. 9 (2005).

A state decision is "contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Williams v. Taylor*, 459 U.S. 362, 405-406; *Bell v. Cone*, 535 U.S. 685, 694 (2002).

State courts are presumed to know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). 28 U.S.C. § 2254(d)'s "highly deferential standard for evaluating state-court rulings demands that state court decisions are to be given the benefit of the doubt. *Id*; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997).

Under the 'unreasonable application' clause, a federal habeas court may grant a writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 406, 413 (2000). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; it must be objectively unreasonable. *Williams*, 529 U.S. at 409-410.

In determining whether a state court is contrary to, or an unreasonable application of federal law, this Court looks to the state court's last reasoned decision. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000). When a state court has not "explained its reasoning on a particular claim," the federal court conducts "an independent review of the record to determine whether the court's decision was objectively unreasonable." *Sass v. California Board of Prison Terms*, 461 F.3d 1123, 1127 (9th Cir. 2006).

Avoiding the pitfalls of 28 U.S.C. § 2254(d) does not require citation of Supreme Court cases nor does it even require awareness of Supreme Court cases, so long as neither the reasoning or the result of the state-court decision does not contradict them. *Early v. Packer*, 537 U.S. 3, 8 (2002).

11

In order to obtain federal habeas relief Cooper must demonstrate that there is no reasonable basis for the state court to deny relief. *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011). If habeas relief depends upon the resolution of an open question in Supreme Court jurisprudence, habeas relief is precluded. *Carey v. Musladin*, 549 U.S. 70, 74-77 (2006).

If a claim has been adjudicated on the merits by a state court, evidence introduced in federal court cannot be considered by the federal courts and has no bearing on federal habeas review. *Cullen v. Pinholster*, 131 S.Ct. 1388, 1400 (2011).

In Cooper's previous appeal to this Court, this Court agreed with Cooper's argument that the state procedural rules under which the Nevada Supreme Court denied his *Brady* and *Napue* claims were not independent of federal law because it was based on the merits of his federal *Brady* claim. *Cooper v. Neven*, 641 F.3d 322, 332-33 (9th Cir. 2011). Therefore, this Court, as did the federal district court, EOR 52-53, should apply AEDPA deference to the adjudication of those claims.

## VI. ARGUMENT

### A. The Federal District Court Correctly Determined That Cooper Is Not Entitled To Federal Habeas Relief On Ground 1, The *Napue* Claim.

As Ground 1 of his third-amended petition, Cooper claims that his conviction was based on false testimony as shown by the recantation of witness

Donnell Wells in violation of his Fifth and Fourteenth Amendment rights to due process and a fair trial. The purportedly false testimony was Wells's trial testimony he saw Cooper shoot the victim. EOR 172.

With respect to Ground 1, the state district court found:

> 9. On July 24, 2000, the Nevada Supreme Court remanded the petition to the district court to determine if Defendant had good cause to excuse the procedural defects because he claimed that one of the eyewitnesses, Donnell Wells, had recanted his trial testimony and that the prosecutor withheld evidence that Donnell Wells received undisclosed benefits for his testimony in violation of Brady v. Maryland, 373 U.S. 83 (1963).

> 10. On March 21, 2002, depositions of Thomas Tait and Kerrie Park (formerly Kerrie Wallace) and other employees of the Clark County District Attorney's Office were taken. The parties stipulated that these depositions be admitted into evidence.

> 11. Mr. Tait was the Deputy Director of Administration at the District Attorney's Office. Mr. Tait testified regarding the policies and procedures in place at the time.

> 12. Kerrie Park was an office assistant in the District Attorney's Office in 1983. She prepared the voucher from which Donnell Wells was paid his witness fees. She only checked one box on the voucher form, not three; however, she testified that the box she checked merely reflected the date she prepared the voucher.

> 13. On June 11, 2002, the deposition of Melvyn Harmon was taken. Mr. Harmon was the Chief Deputy District Attorney who prosecuted Defendant's case.

> 14. An evidentiary hearing was held on February 27,

2004. At the hearing, testimony was heard from (1) Venus Lovetere, an investigator for the Federal Public Defender's Office; (2) Donnell Wells, an eyewitness to the 1983 shooting and murder; (3) Melvyn Harmon, the trial prosecutor; and (4) Cindy Horton, an employee of the Clark County Clerk's Office.

15. Venus Lovetere, an ex-investigator for the Federal Public Defender's Office, testified that on July 30, 1997 she went to the Pioche Prison Camp and took an affidavit from Donnell Wells. RT Evidentiary Hearing 2/27/04 p.8-9.

16. Donnell Wells testified at the evidentiary hearing, claiming he was coerced/coached into the identification of the Defendant by the District Attorney's Office.

17. Donnell Wells's testimony at the evidentiary hearing, regarding what he actually saw during the murder, is equivocal, at best:

Q:    (BY MS. KAUFMAN): Did you tell them at the time that you saw Mr. Cooper shooting?
A:    I can't remember.
Q:    Did you see Mr. Cooper shooting?
A:    To be honest with you, I couldn't really see exactly who was shooting.
Q:    So when you testified in court that you saw this gentleman, Rickey Cooper shooting, was that correct?
A:    I can't remember.
Q.    You can't remember whether you saw him shooting, or you can't remember whether you testified in court that he shot?
A:    I can't remember saying that he did the shooting.
Q:    If you said he did the shooting, would that have been true?
A:    I can't say. I didn't – I can't – I didn't really see his face. I couldn't see him.
Q:    So is it your testimony, sir, that you did not see who shot Ricky Williams?

14

A:      Not really.  I couldn't really see.

Q:      Were you able to describe –

A:      I couldn't see clearly.  I couldn't you know, I just – I thought – I thought it was him.

Q:      But you weren't sure.

A.      Not – not – now, you know in my, you know, at the age I am right now, I can't really honestly say that that was the man shooting.

RT of Evidentiary Hearing, 2/27/04 p. 14-15.

18.     At one point, Wells did not remember testifying that Defendant was the shooter (RT of Evidentiary Hearing 2/27/04 p.15), however, just a few minutes later, Wells did believe that he so testified (RT of Evidentiary Hearing 2/27/04 p. 17).  Wells also stated that he was taken out of school once or twice (RT of Evidentiary Hearing 2/27/04 p.12), but that he only spoke to Mr. Shields, an Investigator with the District Attorney's Office, and Mr. Harmon on the day he testified at trial (RT of Evidentiary Hearing 2/27/04 p.18).  Wells later changed him testimony again to say that he spoke with someone who may or may not have been Melvyn Harmon more than once. RT of Evidentiary Hearing 2/27/04 p.34.  Finally, Wells claimed that he testified at the preliminary hearing, but that he only testified once. RT of Evidentiary Hearing 2/27/04 p.19.

19.     Mr. Wells's testimony that he was taken out of the courtroom in the middle of his testimony to be coached by the Chief Deputy District Attorney or a member of his state was as follows:

A:      (BY MR. WELLS): They told me – he said if you say this that he was – would give me some money, and I remember I started to testify, and he says, no.  He took me out of the courtroom, and they – they – they like, you know, told me what to say pretty much.

RT of Evidentiary Hearing, 2/27/04 p. 15-16.

This was explored on cross-examination:

Q:     (BY MR. SIMON): Now, you indicated when Ms. Kaufman was questioning you that they took you off the stand and told you what to say.  Now let me make sure I understand that.  Do I understand you to say you were at trial giving testimony, and during that time the prosecutor took a recess and took you out in the hall; is that what happened?

A:     Well, he had a – they had a board like that, and they had a diagram put up as, you know, as, you know, the car was going this way and stuff like that.
Q:     And they asked you to go and testify off the diagram, did they?
A:     Yeah.  And as I was testifying, he says, wait.  Wait.  Wait.  And he took me out, and then he says you got to say this this way.

RT of Evidentiary Hearing, 2/27/04 p. 24.

20.     In addition to the above testimony, Melvyn Harmon testified:
Q:     (BY MR. SIMON) In your long career as a prosecutor, do you ever bring a coached witness to give testimony that you sought?
Ms. Kaufman:  Objection. He has no idea unless he did the coaching.
The Court:  Well, let's be specific.
The Witness:  Well, what is the definition of coaching?
Q:     (BY MR. SIMON): Tell them what to say?
A:     Well, I don't ever remember being a witness to the crime myself.  I wouldn't know what to coach the witness about.
Q:     Did you ever coach any witness as to what you wanted them to say at trial?
A:     Never.

RT Evidentiary Hearing, 2/27/04 p. 52, 4-17.

21. This court finds that the transcript of Wells's trial testimony does not reflect any break during Wells's testimony. RT of Evidentiary Hearing, 2/27/04 p. 29-31.

22. Ms. Kaufman, the Deputy Federal Public Defender, tried to rehabilitate Wells's far-fetched tale using extremely leading questions.


Q:  (BY MS. KAUFMAN) Mr. Wells, when Mr. Simon asked you about when the - - you got off the stand.
A:  Uh-huh.
Q:  You said that you don't know whether or not it was actually the trial; is that correct?
A:  I don't know if trial was going on in live action, but I know that he said - - he said, hold on, that he wanted me to step out, and we stepped out.  He says, I need you to say this this way because it's not going right, you know, because at that point I had told them I really don't - - I just don't - - because my friend had already told me he didn't want to have anything to do with it, and I was like I don't - - I don't want to have nothing to do with it neither.  And he says well, we done came this far.
Q:  So what I'm asking you, sir, is when this person took you out whether it's - - it's not the person who came to school to get you?
A:  No.
Q:  The black detective Mr. Shields came to the school to get you, correct?
A:  Yes, ma'am.
Q:  And then you came to this building, correct?
A:  Yes, ma'am.
Q:  And then you met with a white gentleman that could be Mr. Harmon or it could be somebody else, correct?
A:  Yes, ma'am.
Q:  And when you say you don't know whether or not the court was in live action, that's because Mr. Cooper

17

wasn't there, and there was no jury there, correct? There was just you going through your testimony?

A:    Yeah.

Q:    A trial run, basically, a practice.

A:    I guess so that's what it was.

Q:    And that's when you were practicing with whoever it was in the courtroom you were taken outside and told what to say; is that accurate?

A:    Yeah.

Q:    And after that, after they had gotten your testimony right and took you out of the courtroom, after the practice run is when you went in to testify when Mr. Cooper was there or when the jury was there, correct?

A:    Yeah, that I can remember.

RT of Evidentiary Hearing, 2/27/04 p. 34-36; 17-6.

23.    This testimony was refuted by the testimony of Melvyn Harmon.

Q:    (BY MR. SIMON) Do you have a recollection of what time your trial started?

A:    No.

Q:    Do you know whether Mr. Foley heard other matters prior to the start of trial that day?

A:    I don't remember.

Q:    Do you know whether your office used Mr. Foley's courtroom for a pretrial practice the day of Donnell Wells's testimony?

A:    For a pretrial conference?

Q:    No, for a pretrial practice - -

A:    What is that?

Q:    - - where the witnesses come in and testify.

A:    I didn't do that.

Q:    You didn't do that?

A:    No.

Q:    Would you have known if a member of your staff had done it on your case?

A:    With one of my witnesses?

Q:    Yes.

A.    Absolutely.

18

Q:     Did that happen?

A:     No.  It didn't happen.

RT Evidentiary Hearing, 2/27/04 p.47-48; 10-3.

24.     Donnell Wells testified that he was picked up at school, taken to Rancho High School, and then transported by the District Attorney's Investigator to the courthouse where a "practice trial" took place before the real trial began.

Q:     (BY MR. SIMON): So they brought you from school down here to do the practice trial before the real trial; is that correct?

A:     Yes.

Q:     And what time did school start?

A:     About - - if I can remember it was me and this girl, and she went up first, and they told her that they couldn't use her.  Then they had me go up.

Q:     Had you been in school for awhile (sic) when they took you out of school?

A:     No, it was early.  It was, like, first or second period, like that.

Q:     What time did first period start?

A:     8 - - 7:30, 8. I don't know.

Q:     7:30 or 8.  What time did second period start?

A:     I don't know when it started 20 years ago.  I can't remember that far, sir.

Q:     Okay, So in other words, was it Mr. Shields that came and took you out of school that day around first or second period?

A:     Yes, sir.

Q:     And he brought you - - did he bring you straight downtown?

A:     No.  We went to Rancho High School and got that Dee Dee.

Q:     Okay.  So where did he go first, to Rancho High or Clark?

A:     He got - - he got me first at Clark High.

Q:     At Clark High?

A:    Yeah, Clark High.

Q:    And it was first or second period when Mr. Shields picked you up at Clark High?

A:    Yes.

Q:    And then after Mr. Shields picked you up at Clark High, he drove out to Rancho High with you?

A:    Yes.

Q:    How long do you think it took him to get out there?  Maybe 20 minutes?...

A:    It was - - it was real quick.  He just shot down Bonanza, got her, and we came right up here.

Q:    Okay.  Now, Clark High is over on Penwood and Arville, correct?

A:    Yes.

Q:    And that's where you were going to school?

A:    Yes.

Q:    And Rancho High is out on East –

A:    Washington East.

Q:    East Washington?

A:    It's on Washington and Eastern….

Q:    Now, Rancho is out, you've informed me it's on Washington.  It would be east of Eastern, wouldn't it?

A:    I think so.

Q:    Okay.  So you - - after Mr. Shield picked you up from high school, first or second period, he drove with you clear over across town.  Clark's on the west side, Rancho's on the east side, right?

A:    (Nodded.)

Q:    So Mr. Shields - -

I would like the record to reflect that Mr. Wells nodded in the affirmative.

A:    Yes.

Q:    So he drove you from Clark High at Penwood and Arville over to the east side to Rancho High School before he brought you downtown, right?

A:    Yes.

Q:    You think maybe it might have taken him as much as an hour to complete that entire trip before he got to the courthouse?

A:    I can't really say how long it took him

Q:     Did - - was the young lady immediately available when you got there, or did he have to go into the school and get her?

A:     No.  They had like - - they had told us before, they said you got somebody who wanted to see you.  I thought it was my parents, something had happened and my parents were coming to see me.

Q:     But it was Mr. Shields?

A:     Yeah.  They was already there, and they picked me up.  Then we went to Rancho, and she came right out, and we came right over here.

Q:     When you say they was already there, who do you mean?

A:     The detectives.

Q:     Okay.  And then you came downtown, and that's where you had the practice testimony?

A:     Yeah.  She went in first.

Q:     Okay.  She went in first.  They practices with her, didn't like what she said, and then they practiced with you and told you what they wanted you to say; is that correct?

A:     Yes.

Q:     And was it later that same day when you took the stand and gave testimony that you just reviewed a moment ago?

A:     Yes, sir.

RT Evidentiary Hearing 2/27/04 p. 39-42.

25.     Cindy Horton, a Clerk in the Clark County Clerk's Office, testified that the trial of the Defendant started at 11:00 a.m. on November 3, 1983, but that the court had other matters scheduled starting at 9:00 a.m.    RT Evidentiary Hearing, 2/27/04 p. 110, 113.

26.     Melvyn Harmon testified at the evidentiary hearing regarding an alleged undisclosed inducement to Mr. Wells:

Q:     (BY MR. SIMON) Do you recall during your

21

deposition the federal public defender showed you a voucher that was made out to Donnell Wells?

A:     Yes.

Q:     And do you recall that your initials were on that voucher?

A:     I remember that.

Q:     And do you recall that Mr. Wells was paid $75.

A:     Well, I remembered after reviewing the voucher, the witness voucher.

Q:     How much is a witness entitled to be paid if they're a local witness that did not come from out of town?

A:     $25 a day….

Q:     Do you remember how many days Donnell Wells actually testified?

A:     Well, I'm assuming that he testified one day, November the 3rd.

Q:     Now, you initialed the voucher by which he was paid apparently for three days' testimony, correct?

A:     Yes.

Q:     Why would he have been entitled to three days' pay if he only testified one day, if at all?

A:     Well, in terms of the way I approached witnesses, they were entitled to a witness fee each time they appeared here in the courthouse, and I don't remember the specifics.  I have reflected on this matter. I can only say that since I initialed, I signed off on the witness voucher, that then Donnell Wells was here in the courthouse speaking either with me or with Mr. Shields or perhaps with some other representative of the office of the district attorney at least three times.

Q:     Would you have initialed if he had only appeared one time, to your knowledge?

A:     Would I have initialed the voucher - -

Q:     For three days payment?

A:     - - that was paying him for three days?

Q:     Correct.

A:     No.

RT Evidentiary Hearing, 2/27/04 p.53-54, 2-16.

EOR 118-125.

As noted by the state district court, Wells's testimony was refuted, proven to be false, by Mel Harmon's testimony.

With respect to Ground 1, the Nevada Supreme Court held:

> Cooper's primary assertion of cause and prejudice is based on the State's alleged violation of Brady v. Maryland. [footnote 33: 373 U.S. 83 (1963).] Brady and its progeny require the State to disclose evidence that is favorable and material to the defense. [footnote 34: Mazzan v. Warden, 116 Nev. 48, 66, 993 P.2d 25, 36 (2000).] A Brady violation has three components: "the evidence is favorable to the accused; the evidence was withheld by the state, either intentionally or inadvertently; and prejudice ensued, i.e., the evidence was material." [footnote 35: Id. at 67, 993 P.2d at 37.] the second and third Brady components parallel the good cause and prejudice necessary to overcome procedural bars; therefore, proving that the State withheld the evidence generally establishes cause, and proving that the withheld evidence was material establishes prejudice. [footnote 36: See id. at 66-67, 993 P.2d at 36-37.
>
> The prosecutor's reason for withholding evidence is immaterial, and the prosecutor is charged with constructive knowledge of evidence that other state agents withhold. [footnote 37: If a defendant made no request or only a general request for information, the evidence is material when a reasonable probability exists that the result would have been different had it been disclosed. [footnote 38: See Mazzan, 116 Nev. at 66-67, 993 P.2d at 36-37.] However, if the request was specific, the evidence is material if there is a reasonable possibility of a different result had there been disclosure. [footnote 39: See id.]

Here, Cooper contends that he has shown good cause and prejudice because the State allegedly withheld evidence that Wells told investigators he did not see the shooter and that the investigators nevertheless fed Wells facts and promised him money if his testimony satisfied them. Before trial began, defense counsel requested the prosecutor to provide "any discovery that he has on [Wells]." [footnote 40: Trial Transcript (November 1, 1983), at 11.  Because of this specific request, any withheld evidence on Wells is material if there a reasonable possibility that its disclosure would have led to a different result.

Cooper also contends that Wells's recantation of his trial testimony provides good cause, and he argues that the credibility of the recantation is not relevant to overcoming the procedural bars.  This argument is meritless because it focuses only on cause and ignores the requirement of prejudice.  If the recantation is not credible or otherwise fails to show that Cooper suffered any actual and substantial disadvantage at trial, then he fails to establish the prejudice necessary to overcome the procedural bars.  Although the district court did not expressly find that Wells lacked credibility, it apparently considered his hearing testimony to be largely baseless. Its order denying Cooper's petition specifically states that Harmon refuted Wells's allegation of a pretrial practice session, which the order deems "far-fetched."

Regardless of the sincerity of Wells's hearing testimony, his recantation of his trial testimony was not consistent, clear, or complete, and we conclude that the recantation was not material.  At the evidentiary hearing, Wells testified that he could not clearly see who shot Williams, but "I thought it was him" – that is, Cooper – thought "at the age I am right now, I can't really honestly say that that was the man shooting." [footnote 41: EHT at 15.] Moreover, at the evidentiary hearing and during an interview at the District Attorney's office in September

2001, Wells has continued to state, as he did in his trial testimony, that he saw an altercation between Cooper and Williams sometime before the shooting. [footnote 42: Id. at 23-24; Interview with Donell [sic] Williams 9/21/01, at 2.] So Wells has not recanted his testimony indicating that Cooper had a motive to shoot Williams.

Wells has, however, alleged that investigators pressured him and promised him money to testify that he saw Cooper shoot Williams even though he told them he did not really see the shooter. His account of these matters is not very exact or persuasive, however. In regard to a promise of money, the issue on which the record contains the most evidence to compare with Wells's allegations, it appears that Wells was simply paid witness fees for his trial appearance and pretrial meetings with investigators. Further, the investigators are dead and cannot give their own accounts of their interactions with Wells. This fact is prejudicial to the state and reinforces the statutory presumption of prejudice, which Cooper has the burden to rebut.

Of course, a lack of wrongdoing by the investigators does not change the fact that Wells now asserts he did not see who the shooter was. Even if this assertion is honest, we conclude that even absent Wells's identification of Cooper as the shooter, the jury still would have convicted Cooper. It is likely the jury gave little weight to Wells's account of the shooting because it is so at odds with the bulk of the evidence that Cooper shot from a parked car. Although Ragland claimed at trial that she had started to drive when she heard Cooper fire from her car, this testimony was contrary to her statement to police the day after the murder that the car was parked. And even her testimony differed sharply from Wells's description of two series of shots from a moving car before and after it made a U-turn. Wells also testified at trial that he saw the second victim get shot in the hand as that victim stood at the door to a fish market, when the victim's own

testimony was that he was inside the building about 15 feet from the door when he was shot. [footnote 43: Trial Transcript (November 3, 1983), at 276, 284; Trial Transcript (November 4, 1983), at 311.]

In fact, the discrepancy between Wells's testimony and the other evidence regarding the shooting suggests that the investigators did not coach that testimony. The questionable nature of Wells's testimony regarding the shooting was obvious. It prompted the district court to ask him if he understood that he had sworn to tell the truth in front of God and if he was sure the car was moving when the shots were fired.

Cooper contends, however, that the prosecutor and the district court improperly bolstered Wells's testimony, increasing its significance. In making this contention, Cooper completely mischaracterizes the district court's questioning of Wells. Anyway, this court considered and rejected similar claims raised by Cooper in his first post-conviction petition. [footnote 44: Cooper, Docket No. 18679 (Order Dismissing Appeal), at 3, 5.] Our earlier decision is the law of the case and cannot be avoided by more detailed and precisely focused argument. [footnote 45: See Hall v. State, 91 Nev. 314, 315-16, 535 P.2d 797, 798-00 (1975).]

To sum up, we conclude that substantial evidence supports finding that the investigators did not act improperly and therefore that the State did not withhold evidence in violation of Brady. Further, even if Wells falsely testified at trial that he clearly saw Cooper shoot Williams, Cooper still fails to overcome the procedural bars to raise this claim. He demonstrates cause for not raising the claim earlier since Wells's recantation revealed an impediment external to the defense and was not available until Wells spoke up. However, he does not demonstrate prejudice since Wells's description of the shooting at trial was not particularly convincing to begin with, while the other evidence of Cooper's guilt was

26

> strong. [footnote 46: Cf. Callier v. Warden, 111 Nev. 976, 901 P.2d 619, 627-28 (1995) (stating that recanted false testimony requires relief only if a different trial outcome is probable had the testimony not been admitted).] Moreover, Cooper has not rebutted the presumption that his late claim has prejudiced the State. Consequently, the district court did not err in denying Cooper's petition.

EOR 99-105.

Cooper has neither alleged nor shown that the prosecutor knowingly used false or perjured testimony at trial. EOR 167-175.[3] Cooper, relying on *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005), argues that the prosecutor "should have known" the testimony was false or perjured. However, *Napue* does not contain a "should-have-known" standard. Furthermore, under the AEDPA, the Ninth Circuit is no longer permitted to apply its own jurisprudence when entertaining 2254 habeas

---

[3] The United States Supreme Court has not established a "should-have-known" standard. Indeed, such a standard would be incompatible with *Imbler v. Pachtman*, 424 U.S. 409, 439-40 (1976) (holding a lawyer "must be permitted to call witnesses without fear of being sued if the witness is disbelieved and it is alleged that the lawyer knew or should have known that the witness' testimony was false. Of course, witnesses should not be encouraged to testify falsely nor lawyers encouraged to call witnesses who testify falsely. However, if the risk of having to defend a civil damage suit is added to the deterrent against such conduct already provided by criminal laws against perjury and subornation of perjury, the risk of self-censorship becomes too great. This is particularly so because it is very difficult if not impossible for attorneys to be absolutely certain of the objective truth or falsity of the testimony which they present. A prosecutor faced with a decision whether or not to call a witness whom he believes, but whose credibility he knows will be in doubt and whose testimony may be disbelieved by the jury, should be given every incentive to submit that witness' testimony to the crucible of the judicial process so that the factfinder may consider it, after cross-examination, together with the other evidence in the case to determine where the truth lies.")

petitions and must look exclusively to Supreme Court case law. Circuit precedents are not "clearly established Federal law" under 28 U.S.C. § 2254(d)(1). *Marshall v. Rodgers*, 133 S.Ct. 1446, 1450-1451 (2013); *Cullen v. Pinholster,* 131 S.Ct. 1388, 1399 (2011) (under AEDPA, state-court decisions are measured against the Supreme Court's precedents as of the time the state court renders its decision); *Ybarra v. McDaniel*, 656 F.3d 984, 994 (9th Cir. 2011). Not only is the "should-have-known" standard not clearly established, to the extent the Ninth Circuit has used and applied such a standard, such standard is not applicable in this action.

Cooper did not even allege that the prosecutor either knew or should have known the testimony was perjured. EOR 167-175. An allegation only that false or perjured testimony was introduced, however, is not a violation absent knowing use by the prosecution. *Morales v. Woodford*, 336 F.3d 1136, 1152 (9th Cir. 2003) (later recanting declaration failed to show prosecution knew of falsity), amended on other grounds, 388 F.3d 1159, 1179 (9th Cir. 2004); *Murtishaw v. Woodford*, 255 F.3d 926, 959 (9th Cir. 2001); *Carothers v. Rhay,* 594 F.2d 225, 229 (9th Cir. 1979); *Pavao v. Cardwell*, 583 F.2d 1075, 1077 (9th Cir. 1978).

Contrary to Cooper's argument, Wells did not credibly recant his trial testimony. The state district court found the purported recantation, in addition to being fraught with inconsistencies, "equivocal," and "far-fetched." EOR 119-122. Additionally, the state district court found that Wells's assertion he had been

coached was not merely contradicted by the prosecutor's testimony but that it was "**refuted**" by the prosecutor's testimony. EOR 112. The court noted that the trial record reflected no break in the proceedings during which Wells could have been coached. EOR 121; 1348-1350. Those factual findings are binding on this Court. 28 U.S.C. § 2254(e)(1).

Wells's testimony at the post-conviction hearing was that he, "at the age I am right now," could not say Cooper was the man shooting. EOR1334. The post-conviction testimony took place in February, 2004, more than twenty (20) years after Wells's testified at trial in November, 1983. EOR 1320. Given the passage of more than twenty (20) years, it is not surprising Cooper could not or would not testify that it was Cooper he saw. However, that does not mean that Cooper's testimony at trial, more than 20 years earlier, was false, perjured, or that the prosecutor knew the testimony was perjured. *Morales v. Woodford*, supra; *Boyd v. Allen*, 592 F.3d 1274, 1307-08 (11th Cir. 2010).

Additionally, Wells's testimony that he could not remember whether it was Cooper he saw shooting is, in and of itself, a sufficient and reasonable basis upon which the Nevada courts could have denied relief. *Harrington v. Richter*, 131 S.Ct. 770, 774 (2011).

Furthermore, at the evidentiary hearing and during an interview at the District Attorney's office in September 2001, Wells continued to state, as he did in

his trial testimony, that he saw an altercation between Cooper and Williams sometime before the shooting. EOR 729, 1343-1343; 1297. Therefore, Wells has not recanted his testimony indicating that Cooper had a motive to shoot Williams.

Assuming, without conceding that any portion of Wells's trial testimony was actually recanted, the mere recantation of testimony is insufficient for federal habeas corpus relief. *Hysler v. Florida*, 315 U.S. 411, 413 (1942). Indeed, *Carothers v. Rhay*, 594 F.2d 225 (9th Cir. 1979), rejected the very argument that Cooper is attempting to make.

A recantation cannot amount to the knowing use of perjured testimony unless the knowing use of perjured testimony is shown at the time of trial. *Reddick v. Haws,* 120 F.3d 714, 718 (7th Cir. 1997). Mere inconsistencies in testimony do not establish knowing use of perjured testimony. *Allen v. Woodford*, 395 F.3d 979, 995 (9th Cir. 2005). Conjecture and coincidence cannot win the day to establish knowing use of perjured testimony. *Gonzalez v. Wong*, 667 F.3d 965, 993 (9th Cir. 2011). Additionally, recantations should be viewed with suspicion. *Wadlington v. U.S.,* 428 F.3d 779, 783-84 (8th Cir. 2005).

An allegation only that false or perjured testimony was introduced, however, is not a violation absent knowing use by the prosecution. *Napue v. Illinois*, 360 U.S. 264 (1959). Cooper seeks to eliminate the element of "knowing." Of course,

Cooper's argument is contrary to the law. Therefore, Cooper is not entitled to federal habeas relief on Ground 1.

In *Morales*, this Court determined that the witness's recantation did not undermine all the testimony given at trial. Even if this Court were to find Wells recanted his testimony he saw Cooper fire the gun, he did not recant the remainder of his testimony and at least three other witnesses identified Cooper as the shooter. Wells's recantation is inconsistent with the evidence at trial and Cooper is not entitled to federal habeas relief. *Allen v. Woodford*, 366 F.3d 823, 838 (9th Cir. 2004), amended on other grounds, 395 F.3d 979, 994-95 (9th Cir. 2005)

The test for evaluating perjured testimony is found in *U.S. v. Agurs*, 427 U.S. 97, 103 (1976), holding that a conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.

This Court recognized the difference between the *Napue* test of "materiality" and the *Brady* test of "materiality" in *Jackson v. Brown*, 513 F.3d 1057, 1075-76 (9th Cir. 2008). This Court created a hybrid test and analyzed *Napue* and *Brady* errors "collectively." However, the hybrid test espoused and engaged in by this Court is not clearly established federal law as determined by the United States Supreme Court. No clearly established federal law as determined by the United States Supreme Court demands this Court analyze *Napue* and *Brady* violations

"collectively." The simple fact that the United States Supreme Court has described different tests for the different violations demonstrates that the analysis is not and should not be "collective." No United States Supreme Court authority permits this Court to apply such a hybrid test. It would be improper for this Court to apply its hybrid analysis in this action.

Cooper's argument that this Court must consider the effect of his *Napue* and *Brady* claims together fails for several reasons. First, Cooper did not even plead a *Napue* violation because he failed to even allege that the prosecutor knew that Wells's testimony was perjured. EOR 167-175. Second, even if such a violation was alleged, Cooper failed to show the prosecutor knew Wells's testimony was perjured. Thus, no *Napue* claim exists to be considered in conjunction with Cooper's *Brady* claim (a claim which is also insubstantial). Third, even if the claims are substantial, no United States Supreme Court precedent clearly establishes or requires the hybrid analysis engaged in by this Court in *Jackson v. Brown*, 513 F.3d 1057, 1075-76 (9th Cir. 2008), or *Hayes v. Brown,* 399 F.3d 972, 985 (9th Cir.2005). Fourth, examination of *Kyles v. Whitley*, 514 U.S. 419 (1995), shows that to the extent there is to be an analysis of the cumulative effect of alleged errors, such cumulative analysis is limited to proven *Brady* errors. *Kyles* is not authority for the proposition that the materiality of a *Napue* error or errors, even if proved, are to be considered in conjunction with or collectively with the materiality of a *Brady* error

or errors for the purpose of determining in a federal habeas action harmlessness under *Brecht v. Abrahamson,* 507 U.S. 619, 623 (1993).

Because there was no *Napue* violation even alleged or proven relative to Ground 1, there is no basis upon which this Court could "collectively" analyze Ground 1 with Ground 2 or Ground 2 with Ground 1.

Moreover, Cooper has failed to demonstrate that there is no reasonable basis for the Nevada courts to have denied relief on Ground 1. *Harrington v. Richter*, 131 S.Ct. 770, 774 (2011). The reasons stated in the state district court's order and the Nevada Supreme Court's order provide eminently reasonable bases for denying relief, as do the reasons expressed herein. *Harrington v. Richter*, 131 S.Ct. 770, 774 (2011).

Cooper's claim, first raised in his reply to Respondents' answer, that the state should have corrected Wells's false testimony is not properly before this Court. No such claim was raised in Cooper's amended petition regarding Ground 1 (or Ground 2, for that matter). EOR 167-179. Cooper's reply did not and could not operate to amend his petition and habeas claims that are not raised before the district court in the petition are not cognizable on appeal. *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994). Moreover, the claim is unexhausted.

/ / /

**B.    The Federal District Court Correctly Denied Cooper Federal Habeas Relief On Ground 2.**

As Ground 2 of his third-amended petition, Cooper claims that the prosecution failed to produce material evidence regarding witness Donnell Wells, to wit, promises of money made to Wells in exchange for his testimony, in violation of his rights to due process, a fair trial, and equal protection under the Fifth and Fourteenth Amendments, and in violation of *Brady v. Maryland*, 373 U.S. 742 (1970); *Giglio v. United States*, 405 U.S. 150 (1971); and *Napue v. Illinois*, 360 U.S. 264 (1959).  EOR 176.

As noted above, the resolution of this claim is governed by the AEDPA because the Nevada Supreme Court noted that its analysis dovetailed with the second and third prongs of a *Brady* analysis.  *Cooper v. Neven*, 641 F.3d 322, 332-33 (9th Cir. 2011).

A *Brady* violation has three components: the evidence at issue is favorable to the accused; the evidence was withheld by the state, either intentionally or inadvertently; prejudice ensued, i.e., the evidence was material.  Evidence is material only if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial, i.e., the result would have been different.  *U.S. v. Bagley*, 473 U.S. 667, 681-682

(1985).

In its analysis of Cooper's claim, the Nevada Supreme Court noted the second and third *Brady* components parallel the good cause and prejudice necessary to overcome the procedural bars; therefore, proving that the State withheld the evidence generally establishes cause, and proving that the withheld evidence was material generally establishes prejudice. Therefore, this Court must give deference to the Nevada Supreme Court's analysis with respect to at least those prongs of a *Brady* analysis. The Nevada Supreme Court found that the prosecution did not suppress evidence and that the evidence was not material. Those conclusions are not objectively unreasonable and, therefore, Cooper is not entitled to federal habeas relief. This Court must give deference to those determinations. 28 U.S.C. § 2254(d); 28 U.S.C. § 2254(e)(1); *Davis v. Ayala*, 135 S.Ct. 2187, 2197-99 (2015); EOR 99-105.

At an evidentiary hearing in 2004, the following evidence was presented. In July, 1997, an investigator from the federal public defender's office obtained a declaration signed by Donnell Wells who was incarcerated at Pioche Conservation Camp at the time. The declaration stated that detectives pressured him to testify to facts they told him; that they promised him money to testify; that contrary to his trial testimony, he did not see Cooper shoot the victims; and that after his testimony, the detectives gave him a paper he redeemed for roughly $100.00.

EOR1327-1328, 1385.

Cooper called Wells who testified that he became a trial witness after "detective" (actually investigator) Eddie Shields and another man came to his school – he was in the ninth grade – and asked him to answer some questions. They took him from school to the courthouse "once or twice." Wells spoke with them and a third man, but he could not remember whether the third man was prosecutor Mel Harmon. EOR 1329-1333. The following direct examination occurred:

> Q. Did you tell them at the time that you saw Mr. Cooper shooting?
> A. I can't remember.
> Q. Did you see Mr. Cooper shooting?
> A. To be honest with you, I couldn't really see exactly who was shooting.
> Q. So when you testified in court that you saw this gentleman, Rickey Cooper shooting, was that correct?
> A. I can't remember.
> Q. You can't remember whether you saw him shooting, or you can't remember whether you testified in court that he shot?
> A. I can't remember saying that he did the shooting.
> Q. If you said he did the shooting, would that have been true?
> A. I can't say. I didn't - I can't – I didn't really see his face. I couldn't see him.
> Q. So is it your testimony, sir, that you did not see who shot Ricky Williams?
> A. Not really. I couldn't really see.
> Q. Were you able to describe –
> A. I couldn't see clearly. I couldn't you know, I just – I thought – I thought it was him.
> Q. But you weren't sure?

> A. Not – not – now, you know in my, you know, at the age I am right now, I can't really honestly say that that was the man shooting.

EOR 1333-1334.

Wells described a kind of practice session in the courtroom on the same day of his trial testimony during which the investigators told him what his testimony should be. His account was rather confused. He initially seemed to say that his trial testimony was interrupted and he was taken outside the courtroom and instructed how to testify. He eventually indicated that during the interruption and instruction outside the courtroom occurred during a practice on the same day he testified. EOR 1334-1335.

Defense counsel asked Wells if the investigators offered him money and he said yes. The following exchange occurred:

> Q. So he told you if you said that Rickey Cooper was the shooter he would give you money: is that what you are saying?
> A. No. He said – he said, well if – if you testify – if you say it this way right here, then you can get the money, if not we can't use you.
> …
> Q. Did you initially tell them that this was too dark and you didn't know exactly who the shooter was?
> A. Yeah.
> Q. And then did he tell you that he believed Rickey Cooper was the shooter?
> A. Well, he didn't say, if I remember, he didn't say that he believed nothing. He just said Rickey Cooper was the shooter.

Q. So he told you Rickey Cooper was the shooter?
A. Yes.
Q. And he indicated to you that he could only use you and give you this money if you testified to that?
A. In the way he – he wanted me to testify.
Q. Which was that? What did he want you to say?
A. That Rickey Cooper was the shooter.
Q. And you said that at trial, did you not?
A. Yeah, I think so.
Q. After you testified at trial did you get any money?
A. Yes, ma'am.
Q. How much money did you get?
A. It was – it was – they gave me two checks.
…
Q. Was that a significant amount of money?
A. I think one of them was like 60 bucks. One of them was like 40 bucks, something like that.
Q. So you believe you got a hundred dollars.
A. Close to a hundred dollars.
Q. Okay. And that was given to you by whom?
A. The detective.
Q. And what if anything did you do with that money?
A. Well, he took me to the mall, and I bought some jeans and some K-Swiss [sneakers].

EOR 1335-1337.

The two investigators who worked for the district attorney on this case have died (as have the trial defense counsel and trial witnesses including Ragland). By stipulation the parties introduced into evidence a voucher showing that Wells was paid $75.00 in witness fees on the day he testified at trial. The voucher stated "3 days at $25.00." EOR 1440.

On cross-examination of Wells the following exchange occurred:

Q. And how did it happen that Mr. Shields sought you

38

out, do you know?

A. Oh, because I had told Ricky Williams' mom that I was there.

Q. What did you tell Ricky Williams' mom.

A. I told Ricky Williams' mom that I was there when him and Rickey Cooper had a argument, and I was there when the shooting happened.

EOR 1342-1343.

With respect to this claim, the Nevada Supreme Court found:

> Wells has, however, alleged that investigators pressured him and promised him money to testify that he saw Cooper shoot Williams even though he told them he did not really see the shooter. His account of these matters is not very exact or persuasive, however. In regard to a promise of money, the issue on which the record contains the most evidence to compare with Wells's allegations, it appears that Wells was simply paid witness fees for his trial appearance and pretrial meetings with investigators. Further, the investigators are dead and cannot give their own accounts of their interactions with Wells. This fact is prejudicial to the state and reinforces the statutory presumption of prejudice, which Cooper has the burden to rebut.

EOR 102-103.

Cooper failed to establish that promises of money were made to Wells in exchange for perjured testimony. That being the case, the claim fails. The factual premise for Cooper's claim does not exist. All Wells got for his testimony were the standard witness fees. That conclusion is not objectively unreasonable. Therefore, Cooper is not entitled to federal habeas relief on Ground 2.

The Nevada Supreme Court concluded "that substantial evidence supports a finding that the investigators did not act improperly and therefore that the state did

not withhold evidence in violation of <u>Brady</u>." EOR 104. In support of this finding, the court noted that Wells's account of the investigators pressuring him and promising him money in exchange for fabricated testimony was unconvincing and that "it appears that Wells was simply paid witness fees for his trial appearance and pretrial meetings with investigators." EOR 103.

Wells's testimony at the 2004 evidentiary hearing was confused, ambiguous, and internally inconsistent. As an example, the Nevada Supreme Court mentioned Wells initially testified it was *during his testimony at trial* that the illicit pressuring occurred – more specifically, Wells implausibly claimed that the proceedings were halted as he was testifying from a diagram at trial, whereupon the "detectives" took him out into the hallway to coach him before he resumed his testimony. EOR 1335-1336, 1344-1348, 1350-1351. After the deputy district attorney asked him to pinpoint in the trial transcript where that occurred and defense counsel asked him some leading questions, Wells modified his account to indicate that it was during a practice session that this occurred.[4] EOR 1354-1355.

The federal district court assigned little weight to Wells's 1997 declaration because it is notably lacking in specific details surrounding the purported coaching of his trial testimony. As noted by the federal district court, Wells purported to

---

[4] That account prompted the district court to question why it would be necessary for the investigator to take Wells out of the courtroom and into the hallway if it was merely a rehearsal of his testimony.

recall using the money to buy "K-Swiss shoes and Levi's brand jeans" at the "Meadows Mall," but the remaining subject matter in the declaration is far less specific. The fact that Wells received money for testifying is not in dispute (only whether the money was a legitimate witness fee or compensation for fabricating witness testimony). Thus, it is entirely conceivable that Wells did, in fact, use the money to purchase those specific items at that particular location, which would explain his ability to recall that event in such detail.

The September 2001 interview conducted by the district attorney investigator is also suspect in that, similar to his initial testimony at the evidentiary hearing, Wells told the investigator that the coaching occurred in the middle of his direct examination at Cooper's trial. EOR 1300-1302. Despite Cooper's argument to the contrary, Wells's refusal to capitulate to the investigator's attempt to convince him that the money he received was merely a legitimate witness fee does not necessarily lend credibility to Wells's version of events.

The Nevada Supreme Court's determination that the state did not improperly withhold evidence in violation of *Brady* (or by implication, knowingly present false testimony in violation of *Napue*) is objectively reasonable and, therefore, entitled to deference under 28 U.S.C. § 2254(d).

Even if Wells's testimony at trial was inaccurate, there is no *Brady* or *Napue* violation because the state did not withhold exculpatory evidence or have reason to

know Wells was providing false testimony.

Cooper argues that the Nevada Supreme Court determined that he had made a showing of good cause with respect to his *Brady* claim and, in so doing, concluded that he had satisfied the first two elements of his *Brady* claim. That argument is based on a misreading of the Nevada Supreme Court's opinion. In the briefs Cooper filed with the Nevada Supreme Court, Cooper advanced two distinct grounds for finding good cause and prejudice to excuse his defaults: 1) the state's suppression of "*Brady/Giglio/Napue*"[5] information and 2) the "newly discovered evidence of Wells's recantation." EOR 2082, ECF No. 65-2 at 15-33, ECF No. 65-4 at 11-35. While its analysis of the two grounds overlaps, the Nevada Supreme Court addressed each ground separately in its decision. EOR 102-103. As noted, the court explicitly concluded that "the State did not withhold evidence in violation of *Brady*." EOR 104. The court's conclusion that Cooper had shown good cause was based entirely on the fact that "Wells recantation revealed an impediment external to the defense as was not available until Wells spoke up." Id.[6]

---

[5] Referring to *Giglio v. United States*, 405 U.S. 150 (1972), holding that nondisclosure of impeachment evidence falls within the *Brady* rule.

[6] The federal district court was aware that this Court in *Cooper* stated: "The [Nevada Supreme] Court found that Cooper had demonstrated cause for not raising the Brady violation and witness recantation claims earlier, but that he had failed to demonstrate prejudice." *Cooper*, 641 F.3d at 326. However, that statement is merely part of this Court's recitation of factual and procedural background. And, whether or not the Nevada Supreme Court found cause based on Cooper's claim was not germane to the holding in *Cooper*.

Because the Nevada Supreme Court concluded that the state did not improperly withhold evidence in the first place, the court did not specifically address whether the non-disclosed evidence was material. Instead, the court's prejudice analysis focused primarily on the ground for which it found good cause – i.e., Wells's recantation. In that regard, the court found insufficient prejudice because the recantation was "not consistent, clear, or complete" and Wells did not recant an important aspect of his testimony, i.e., that he "saw an altercation between Cooper and Williams some time before the shooting," which indicated that "Cooper had a motive to shoot Williams." EOR 102. The court then further concluded that, even if Wells's belated claim about not seeing the shooter was accurate, the jury would still have convicted Cooper without Wells's identification because Wells's account of the shooting at trial conflicted with the "bulk of the evidence" and there was ample other evidence that Cooper was the shooter. EOR 103.

In light of the foregoing, Cooper misses the mark with his arguments claiming that the Nevada Supreme Court did not apply the correct materiality standards under *Brady* and *Napue*. The Nevada Supreme Court correctly noted that the materiality inquiry under *Brady* asks whether "a reasonable probability exists that the result would have been different" had the evidence been disclosed. EOR 101. *See United States v. Bagley*, 473 U.S. 667, 682 (1985) (citing the same standard).

And, while the Nevada Supreme Court was ostensibly applying only *Brady*, not *Napue*, the court held that, for state law reasons, a relaxed materiality standard applied to Cooper's claim. That is, the Nevada Supreme Court cited the relevant inquiry as whether "there is a reasonable possibility of a different result had there been disclosure," which is essentially the same as, and certainly no stricter than, the standard applied in cases of *Napue* error. EOR 101. (emphasis added). *See United States v. Agurs*, 427 U.S. 97, 103 (1976) (noting that a *Napue* violation is material when there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury). As such, it would not have been "contrary to" clearly established Supreme Court law for the purposes of § 2254(d)(1) if the Nevada Supreme Court applied this standard. *Early v. Packer*, 537 U.S. 3, 8 (2002) (holding that state court is not required to cite Supreme Court cases, or even be aware of them, to avoid its decision being "contrary to" Supreme Court precedent). As explained, however, the Nevada Supreme Court concluded that Cooper had not shown that the state improperly withheld evidence to begin with, so neither materiality standard was satisfied.

Cooper also argues that the Nevada Supreme Court "misapprehended Wells's testimony with respect to his recantation and has overlooked and minimized the impact that Wells's testimony had on the jury." EOR 2037. As to the former, Cooper contends that Wells's recantation "satisfied the criteria of reliability."

EOR 2039.   For the reasons set forth above, the federal district court agreed with the Nevada Supreme Court's characterization of Wells's recantation as being "not consistent, clear, or complete."  That assessment is not unreasonable.

The Nevada Supreme Court's assessment of the impact of Wells's testimony is also objectively reasonable.   Cooper is correct that the police statements, preliminary hearing testimony, and trial testimony of various witnesses to the shooting has inconsistencies.   However, as to the focal point of Wells's recantation, his identification of Cooper as the shooter, all of those sources taken together lead to the inescapable conclusion that Cooper fired the shots that killed Williams and injured Norman.  Thus, Wells's testimony on that point added very little to the State's case against Cooper.  As for witnessing an altercation between Cooper and Williams prior to the shooting, there is no evidence that Wells recanted that aspect of his testimony and, in fact, he confirmed it during his September 2001 interview with the district attorney investigator and in his testimony at the 2004 evidentiary hearing.  EOR 1297, 1343.  The record contains no discernible reason for Wells to have fabricated that portion of his testimony.

Lastly, Cooper argues that, irrespective of whether the money paid to Wells was a legitimate witness fee, the Nevada Supreme Court "disregarded the uncontradicted evidence that Wells believed he was being offered "money" in exchange for his testimony against Cooper." EOR 2043.   According to Cooper,

the Nevada Supreme Court's failure to conclude that this "undisclosed financial reward for [Wells's] testimony was not *Brady* material" constituted an unreasonable application of Supreme Court precedent and an unreasonable determination of the facts. EOR 2046.

This argument is untenable to the extent it suggests that the prosecutor was obligated to disclose to the defense Wells's *perception* of the payment he was to receive for his testimony. Cooper has not shown that the manner or amount that Wells was paid differed appreciably from the way other witnesses were compensated. NRS § 50.225 provides that each witness "attending the courts of this State in any criminal case,…in obedience to a subpoena,…is entitled…[t]o be paid a fee of $25 for each day's attendance." Moreover, Cooper concedes that the district attorney in this case had a "long-standing practice of witness fee payments for pretrial conferences." EOR 2045. Accordingly, the Nevada Supreme Court's conclusion that the payment of the fee was not *Brady* material is not unreasonable. *See United States v. Wicker*, 933 F.2d 284, 293 (5th Cir. 1991) (holding that the government's failure to disclose witness fees did not constitute a *Brady* violation where the procedure for payment of witness fees was public information and the defense made no specific request for witness fee information). Furthermore, no United States Supreme Court case requires the prosecutor disclose a witness's perception as suggested by Cooper.

Cooper's arguments that the prosecutor's statements in the closing arguments of the trial and his testimony in the 2002 deposition "confirm" that Wells's testimony at trial was material fail. The prosecutor, contrary to Cooper's arguments, confirmed no such thing. Cooper ignores the facts the jury was instructed that: 1) the guilt or innocence of the defendant was to be determined by the evidence presented in the case; 2) statements, arguments and opinions of counsel are not evidence in the case; and 3) whatever counsel may say in arguments, "you will bear in mind that it is your duty to be governed by the evidence… and the law as given to you in these instructions…." Jury Instructions 27, 28, and 35, EOR 969, 970, and 977. The jury is presumed to follow the instructions it is given. *Penry v. Johnson*, 532 U.S. 782, 799 (2001); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987).

Similarly, the trial court's questioning of Wells's testimony does not prove or demonstrate anything, much less the materiality of Wells's testimony.

Cooper attempts to raise for the first time a claim that his counsel was deprived of his right to cross-examine Cooper. AOB at 39-42. No such claim was presented in Cooper's third-amended petition or with respect to Grounds 1 or 2. EOR 167-179. Cooper's claim, first raised in his reply to Respondents' answer, is not properly before this Court. Cooper's reply did not and could not operate to

amend his petition. *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994). Moreover, the claim is unexhausted.

Cooper's arguments assume the truth of Wells's purported recantation notwithstanding the factual findings of the Nevada courts to the contrary and ignores the overwhelming evidence he was the shooter.

Cooper is not entitled to federal habeas relief on Ground 2.

Moreover, Cooper has failed to demonstrate that there was no reasonable basis for the state courts to deny relief. *Harrington v. Richter*, 131 S.Ct. 770, 774 (2011). The reasons expressed by the Nevada courts are reasonable bases to deny Cooper federal habeas relief on his claim presented in Ground 2, the *Brady* claim.

### C.    As the Nevada Supreme Court Held, the Evidence Against Cooper Is Overwhelming.  Therefore, Any Error Is Harmless.

At approximately 7:33 p.m. on April 13, 1988, Sergeant Michael Bunker of the Las Vegas Metropolitan Police Department responded to the scene of a shooting in the area of the intersection of "H" Street and Lake Mead Boulevard in Las Vegas, Nevada. At the scene, Sergeant Bunker observed a deceased black male, the victim, lying on the ground, the victim of an apparent gunshot wound. Sergeant Bunker was notified that a second person had also been injured in the immediate vicinity. This second person was Will Norman, who had sustained a gunshot wound to his left hand. EOR 461-471.

Dr. Giles Green conducted an autopsy upon Ricky Williams, the deceased victim, and determined that Williams' death had resulted from a gunshot wound to the chest. Williams had received two gunshot wounds, the fatal shot which entered through the back and exited through the chest and a wound on the inside of the left foot. In Dr. Green's opinion, those wounds were neither accidental nor self-inflicted. EOR 510-524.

According to Larry Collier, he and some friends had been in the area of the shooting during the early evening hours of April 13, 1988. Collier had gone to the area to purchase some "sherm," marijuana cigarettes laced with phencyclidine. After purchasing the "sherm," Collier noticed a car in the parking lot where he had been standing. The person seated in the front passenger side of the car called out to Collier, who then approached the vehicle. Upon reaching the car, Collier recognized the passenger, Rickey Cooper, whom he had known for about three (3) years. EOR 638-639. Cooper asked Collier what he had in his hand and Collier displayed the "sherm," at which time Cooper told Collier to give him the "sherm." Collier was so close to Cooper that he literally had his hand under Cooper's nose so that Cooper could smell the sherm. EOR 641-642. When Collier refused the demand, Collier saw Cooper pull out a rifle which struck Collier's hand and Cooper fired. Cooper began firing the rifle while perched on his knees inside the car. Collier ran back to his car. Ricky Williams, the murder victim, had been standing behind Collier when

49

the shooting began. EOR 630-665. Collier identified Cooper as the shooter. EOR 638-639. 640-647.

Jimmy Thompson, who observed the shooting, testified at trial that the barrel of a gun had been protruding outside the passenger's window of the car in which Cooper was riding, shots were fired, and Ricky Williams ran from the car clutching his chest. EOR 536-556.

Will Norman had been working in a seafood market in the vicinity of the shooting on April 13, 1983. As the shooting erupted, Norman was plugging in the electric cord to his radio when he heard a "pow" and felt something hit his hand. Thinking that the cord had hit his hand, Norman looked down and discovered that he had been shot and was bleeding. EOR 751-760.

Debra Manor, who had been with Collier on the evening in question, and Sharon Shawnette Ragland, who had been with Cooper, gave statements to the police the day after the incident, both identifying Cooper as the gunman who had fired the fatal shots. EOR 440, State's Trial Exhibits 33 and 34; EOR 584-595; EOR 688-695.

Ragland testified at trial that during the early evening hours of April 13, 1983, she had been driving to the market when she stopped to pick up Cooper and his two friends. Cooper, whom she had known for about two months at the time of the murder, was sitting right next to her in the front passenger seat. EOR 562-563, 566, 567, 572, 573, 575, 576, 684-685. Ms. Ragland arrived at the market, located near

the intersection of "H" Street and Lake Mead Boulevard, purchased a few items and returned to the car. EOR 564, 566-568. Consistent with her statement made to police the day after the shooting, Sharon Ragland testified that a man selling sherm approached Cooper as he sat in the car. EOR 586. However, Ragland stated that she did not see Cooper with a gun and did not see the gun. EOR 566. She did testify, however, as she began driving away, she heard Cooper, who was sitting right next to her in the front passenger seat, shoot a gun twice from the passenger side of the car. EOR 566, 567, 572, 573, 575, 576.

Manor testified that on the evening of April 13, 1983, she saw "Shawnette" (Ragland) and Cooper in a car. Shawnette (Ragland) was driving and Cooper was in the front passenger seat. EOR 684-685. Manor said she observed Collier (Speedie, Speed) approach Cooper, whom she recognized and had known for fifteen or sixteen years, in the car, then noticed the barrel of a gun sticking out the car window on the passenger side. Ms. Manor next heard shots and saw Collier run from the car. EOR 679-690.

Manor admitted she gave a statement after the shooting in which she stated Cooper pointed the gun at "Speed" (Collier), Speed knocked the gun away, the gun went off, and that Cooper fired two more shots at Speed. EOR 692-693.

In response to the prosecutor's questions, Ms. Manor admitted she had changed her testimony both at trial and at the preliminary hearing from the statement

she had given to police identifying Cooper as the shooter. She testified she did not want to testify because she was afraid. EOR 694-696. She had moved from her former residence after receiving threats to her and her two children, including a rock having been thrown through her window with a message tied to it. Id.

Even if this Court were to improperly credit Wells's purported recantation, the remaining evidence still overwhelmingly shows Cooper was the shooter. Collier, Ragland, and Manor all identified Cooper as the shooter. Collier had his hand holding the sherm under Cooper's nose when Cooper produced a gun and started firing. Ragland, who was driving the car, testified she was sitting right next to Cooper when she heard Cooper fire the shots. Manor identified Cooper as the shooter even though she had been threatened. Nothing Cooper has offered undermines the testimony given by Collier, Ragland, or Manor.

Even if one were to incorrectly accept Cooper's *Napue* and *Brady* claims, which, at their core, challenge Wells's identification of Cooper as the shooter, there simply is no question that Cooper was the shooter. There is no question about Ragland's, Manor's, or Collier's ability to identify Cooper as the shooter. There is no question as to their identification of Cooper. Ragland testified she had known Cooper for about two months at the time of the shooting. Ragland testified Cooper was sitting right next to her when she heard Cooper shoot. Manor also testified she recognized Cooper, whom she had known for fifteen (15) or sixteen (16) years, as the

shooter. EOR 684.   Nor is there any challenge to Collier's identification of Cooper. Collier recognized Cooper whom he had known for about three years.  EOR 638-639.  Collier was within touching distance of Cooper, holding sherm under Cooper's nose, when Cooper brought the gun out and fired.  EOR 641-642. Thus, even if one were to conclude Wells's identification of Cooper as the shooter was the by-product of a *Napue* and/or *Brady* violation, there were three other witnesses, two of which had known Cooper for years and one who was sitting right next to him when he fired the shots, who identified Cooper as the shooter.

Any purported error is harmless.  *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  Furthermore, this Court must give deference to the Nevada Supreme Court's finding that any error was not material.  *Davis v. Ayala*, 135 S.Ct. 2187, 2197-2199 (2015); EOR 99-105.

## V.  CONCLUSION

This Court should affirm the district court's denial of federal habeas relief on Grounds 1 and 2.

RESPECTFULLY SUBMITTED this 5th day of April, 2016.

ADAM PAUL LAXALT
Attorney General

By:  /s/ Robert E. Wieland
ROBERT E. WIELAND
Senior Deputy Attorney General

## VIII.  **STATEMENT OF RELATED CASES**

Respondents are not aware of any related cases.

RESPECTFULLY SUBMITTED this 5th day of April, 2016.

ADAM PAUL LAXALT
Attorney General

By:   /s/ Robert E. Wieland
      ROBERT E. WIELAND
      Senior Deputy Attorney General

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that pursuant to Fed. R. App. P. 32(a)(7)(C) and 9th Cir. R. 32-1, the attached answering brief is proportionately spaced, has a typeface of 14 points or more and contains 13,951 words.

RESPECTFULLY SUBMITTED this 5th day of April, 2016.

ADAM PAUL LAXALT
Attorney General

By:    /s/ Robert E. Wieland
ROBERT E. WIELAND
Senior Deputy Attorney General

55

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I am an employee of the Office of the Attorney General and that on the 5th day of April, 2016, I electronically filed the foregoing **RESPONDENTS-APPELLEES' ANSWERING BRIEF**, with this Court's Electronic Filing System, CM/ECF, which will serve the following registered users:

**Renee Valladeres, Federal Public Defender**
**Megan C. Hoffman, Assistant Federal Public Defender**
**Danice Arbor Johnson, Research and Writing Attorney**
**411 E. Bonneville Ave., Ste. 250**
**Las Vegas, NV 89101**
**Megan_hoffman@fd.org**


/s/  Mary C. Wilson
An Employee of the
Office of the Attorney General

56